## In re MATHEWS CONSOLIDATED SLATE CO.

(District Court, D. Massachusetts. November 24, 1905.)

**1. BANKRUPTCY—JURISDICTION—CORPORATIONS.**

A corporation organized under the laws of a state cannot be a "resident" of another state, within the meaning of Bankr. Act July 1, 1898, c. 541, § 2, cl. 1, 30 Stat. 545 [U. S. Comp. St. 1901, p. 3421], so as to confer jurisdiction on a court of bankruptcy in the latter state of proceedings against it.

**2. SAME—PRINCIPLE PLACE OF BUSINESS.**

The business of a New Jersey corporation was that of operating slate quarries and slate mills, and the sale of their products. Its certificate of incorporation provided that it should have one or more offices, and that its principal office in the state should be at Jersey City, and it maintained an office there at which its stockholders' meetings were held. Its quarries and mills were near Poultney, Vt., partly in that state and partly in New York, and it maintained an office there in charge of a resident manager, from which the production and shipment of its slate was directed. Its executive office was in Boston, Mass., from which supreme direction and control of all of its operations and dealings and over its entire property and plants were exercised, and where its directors' meetings were held. Its sales and collections were made from there, its books were kept there, and also its stockbook, although by the law of New Jersey it was required to be kept at its office in that state. Regular reports of shipments and stock on hand were made to that office from the Poultney office. Its principal banking business was done in Boston; remittances being made from there to Poultney and a point in New York to meet its pay rolls. All of its officers resided in Boston and were to be found at its office there, except the general manager, who made frequent trips to Poultney. *Held*, that its principal place of business was in Boston, within the meaning of Bankr. Act July 1, 1898, c. 541, § 2, cl. 1, 30 Stat. 545 [U. S. Comp. St. 1901, p. 3421], and that it was subject to bankruptcy proceedings in that district.

**3. SAME—PRINCIPAL BUSINESS—MINING.**

A corporation, whose business is the quarrying of slate and selling the same after it has been split into roofing slate and trimmed ready for use or cut into structural slate, the cost of such operations being from 20 to 40 per cent. of the total cost of production is engaged both in mining and manufacturing, and is subject to adjudication as a bankrupt, under Bankr. Act July 1, 1898, § 4b, as amended in 1903 (Act Feb. 5, 1903, c. 487, 32 Stat. 797 [U. S. Comp. St. Supp. 1905, p. 683]), whichever may be regarded as its principal business.

[Ed. Note.—What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank v. First Nat. Bank, 42 C. C. A. 4.]

**4. SAME—CONSTRUCTION OF STATUTE—"MINING" INCLUDES QUARRYING.**

The word "mining," in Bankr. Act July 1, 1898, § 4b, as amended in 1903 (Act Feb. 5, 1903, c. 487, 32 Stat. 797 [U. S. Comp. St. Supp. 1905, p. 683]), is used in a broad sense and includes quarrying as of slate from an open quarry.

In Bankruptcy. On involuntary petition.

The following is the report of Referee Olmstead, acting as master on question of adjudication:

This creditors' petition, filed June 22, 1905, against the Mathews Comsolidated Slate Company, seeking an adjudication on the ground that it had committed acts of bankruptcy, was referred to the referee acting as master, under rule 12 of the general orders in bankruptcy (89 Fed. vii, 32 C. C. A. xvi), to ascertain and report the facts.

On July 28, 1905, one Bainbridge W. Burdick, a creditor, a citizen of the state of New York, and a resident of Albany, appeared and filed an answer to said petition. The answer put in issue all the allegations of the petition, and especially denied that the corporation had its principal place of business in this district, or was such a corporation as is amenable to the bankruptcy act. After hearing testimony in court and the able arguments of counsel, I find the following facts: First, that the claims of the three petitioning creditors are valid and provable, and that they amount in the aggregate to the sum of $500 and are not secured. Second, I find that on June 9, 1905, the corporation voted, and on June 16th duly admitted in writing its inability to pay its debts and its willingness to be adjudged a bankrupt on that ground. The principal grounds of defense which were urged by Selden Bacon, Esq., as counsel for the objecting creditor, were: First, that the corporation did not have its principal place of business, reside, or have its domicile within the District of Massachusetts; and, second, that it was not a corporation which could be put into bankruptcy under the provisions of section 4b of the present bankrupt act as amended. Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 [U. S. Comp. St. Supp. 1905, p. 683].

It appeared that the opposing creditor, Burdick, had obtained the advantage of an attachment in the state of New York. A receiver of this corporation was appointed by the United States Circuit Court in and for the District of Massachusetts, and ancillary or auxiliary receiverships were had in the Districts of Vermont and New York. In the latter district, the decree appointing Mr. Daniel C. Stanwood the same receiver in all the jurisdictions was modified by Judge Wallace in favor of the attaching creditor. It is the established rule in New York that the attaching local creditors are to be preferred over foreign or other creditors. Sands v. E. S. Greeley & Co. (C. C.) 83 Fed. 772; Id., 88 Fed. 130, 31 C. C. A. 424.

This case therefore presents an excellent illustration of the peculiar advantages of uniform laws on the subject of bankruptcy throughout the United States. If the New York creditor is to obtain this advantage over the other creditors under the faulty state receiverships, where each court is a law into itself, the creditor will thus obtain a preference over the others in violation of the salutary rule which exists in bankruptcy administration that equality is equity. It was clearly the purpose of the framers of the Constitution when they provided for a uniform system of bankruptcy that such local or state preferences and discriminations should not be tolerated. The evidence submitted at the hearing was to the effect that this corporation was organized under the laws of New Jersey, and had its headquarters or principal place of business in Boston at 199 Washington street, where it maintained its main office. Its business was that of quarrying and manufacturing slate. All its principal offices were in Boston, all its proceedings at its quarries, which it either owned or leased in the states of Vermont and New York, were directed from its Boston office as its headquarters, its bank accounts were kept in Boston, and it has had on hand as much as $100,000 to its credit in Boston, while at Poultney, Vt., it had in the bank for the purpose of paying its help not more than $2,000. It had issued bonds, and the coupons thereon were paid at Boston at the City Trust Company, one of the banks at which it deposited. In connection with its numerous quarries, it maintained mills which were engaged in the process of finishing and manufacturing the slate into building material ready for sale upon the market. This building material was stored at or near its mills, but the sales thereon were superintended from its Boston office. It had a superintendent at Poultney, and Mr. Mathews had been its former general manager, but had become interested, before he severed his connection with the company, in a rival quarry in the neighborhood of Poultney, and the evidence also showed that he was an indorser on the notes given to Mr. Burdick. It further appeared that the prices were determined by the general manager of the company at Boston, that salesmen were employed here, and bills sent to customers from the Boston office and remittances made here. Although all shipments were through the Poultney office, it appeared that not more than 1 per cent. of the sales were made from there. I find, therefore, it to be a fact that the company's principal place of busi-

ness and its headquarters were at Boston, within the District of Massachusetts. Perhaps an analogy to the methods conducted by this corporation may be found in the case of such railroad companies as the Chicago, Burlington & Quincy and Atchison, Topeka & Santa Fé, which certainly had their principal place of business in Boston, although their operations were conducted in the far west. In the cases of manufacturing corporations doing business in a similar way, having mines or factories in distant parts of the country, the cases of American Woolen Company and Calumet & Hecla Company may be mentioned.

The objecting creditor also laid great stress upon the fact that this corporation was not amenable to bankruptcy, inasmuch as it did not fall within the terms of submission "b" of section 4, and furthermore that a quarry conducting its business in the open, and unlike that of a mine where the operations are said to be usually under ground, did not come within the definition of a mine. In other words, that Congress, in amending the act by the use of the word "mining," had omitted to provide for a quarry. · It was also contended that the concern, although the evidence showed it was principally engaged in manufacturing, trading, and mercantile pursuits, was not so occupied, inasmuch as its business was that of quarrying. In the absence of a final decision of the supreme court of the United States, it is useless to attempt to reconcile the various conflicting decisions of the courts under this provision of the law. That they have adopted an altogether too narrow and limited construction may be apparent if consideration is had of the origin and development of the language of the present Torrey bill. An examination therefore of the evolution of the terms used in section 4, as gathered from the Congressional Record and Debates in Congress may be of assistance. Under the act of 1867, "all money, business or commercial corporations and joint stock companies" were embraced in an involuntary petition. Rev. St. § 5122. The terms of this act it would seem were therefore very broad, and they were held to include even a railroad corporation. New Orleans S. F. & L. R. Co. v. Delamore, 114 U. S. 501, 5 Sup. Ct. 1009, 29 L. Ed. 244. Black on Bankruptcy, p. 30. The same was true, also, of insurance companies. When the Torrey bill passed the House of Representatives in 1898 the language was as follows: "Section 3, b. Any person owing debts to the amount of one thousand dollars or over, if adjudged an involuntary bankrupt upon an impartial trial, shall be subject to the provisions of this act, except: (1) A national bank; (2) a person engaged chiefly in farming or the tillage of the soil; (3) a wage earner." Cong. Rec. Feb. 16, 1898, 55th Cong., vol. 31, pt. 2, p. 1780. Under section 1 of the act, the word "persons" includes corporations. A comparison of this provision with that of the act of 1867 will make it clear that Congress intended to even enlarge upon the provisions of the act of 1867, certainly not to limit them. The limitations were only upon national banks, farmers, and wage earners. This identical language of the Bill as it passed the House existed in the original Torrey bill when first introduced in the Fifty-First Congress. For the history of the Torrey bill, see In re Murphy, 3 Am. Bankr. Rep. 499, 501. In the analysis of the Torrey bankrupt bill attached to a report of the judiciary committee, No. 1674 to H. R. 9348, 52d Congress, 1st Session, appears this explanation of the language of the act just quoted:

"Sec. 3. Who may become bankrupts. There is already in existence a satisfactory law for the control and liquidation of national banks. Since the government is responsible for the money issued by these banks, in the event of their failure there is good reason why it should have control of their liquidation. It is said that persons engaged chiefly in farming or the tillage of the soil and wage earners do not wish to become subjected to involuntary bankruptcy; the bill does not therefore include them among the persons who may become involuntary bankrupts; objection would not be made if they should ask its extension to them. They may voluntarily take the benefits of the act."

The present language of the act was the work of the Conference Committee consisting of Senators Hoar, Lindsay, and Nelson on the part of the

Senate and of Representatives Henderson, Ray and Terry of the House. In the statement of the conferees which appears in the Congressional Record of the Fifty-Fifth Congress, June 28, 1898, vol. 31, pt. 7, pp. 6426 to 6428, under clause 12, is the following:

"12. A change has been made in the bill as agreed upon as to who may be adjudged involuntary bankrupts by including an unincorporated company and corporations engaged principally in manufacturing, trading, printing, publishing or mercantile pursuits. It is believed that such corporations should be subject to the involuntary provisions of this bill. In these times the formation of corporations for these purposes is very common. A great railroad and transportation companies and banks incorporated under any law are left to be dealt with by the laws of the state creating them. It would lead to much confusion and hardship and many complications should we undertake to subject the great railroads and transportation corporations to the provisions of this act. It is believed that they can be better dealt with under other laws."

Thus it appears that it was not the intention of the conferees or Congress to limit the law as it has been construed to be limited under various decisions of the courts under the present act, but the intention was to exclude "national banks and the great railroad and transportation corporations." In the remarks of Congressman Ray, afterwards chairman of the judiciary committee, and at present the Honorable District Judge for the Northern District of New York, which are to be found on page 6435 of the Congressional Record, June 28, 1898, referring to the modification of this language by the conferees, nothing is said by him which would indicate that the language of the act of 1898 was of a more limited nature than that of the act of 1867. In fact Congress intended that the act of 1898 should be as broad as the act of 1867, except that national banks, railroads, transportation companies, farmers, and wage earners should be excluded, but that all business corporations should be amenable to the act. When the bill was amended in the Fifty-Seventh Congress under the so-called "Ray Bill," the word "mining" was added to correct certain decisions. This is clearly shown by the analysis of the bill, which is to be found in the Congressional Record (pages 7439, 7440) June 17, 1902. The decisions corrected by the amendment are In re Chicago-Joplin Lead & Zinc Co. (D. C.) 104 Fed. 67; McNamara v. Helena Coal Co., 5 Am. Bankr. Rep. 48; In re Keystone Coal Co., 6 Am. Bankr. Rep. 377, 109 Fed. 872. That the word "mining" was intended to be used by Congress in a generic sense is clear from the foregoing attempt at a historical evolution of the act.

All the cases cited by the able counsel for the objecting creditor to the effect that a quarry is not a mine are met by the recent decision of the House of Lords, Midland Ry. Co. v. Robinson, 15 App. Cases, 19. Nor is this subject a novel one in this district. In the very clear opinion of Mr. Referee Gibbs, in Re Quincy Granite Quarries Co., which was affirmed by the honorable district judge, this subject was passed upon, and it was decided that a quarry was a mine and was amenable to the provisions of section 4b. I find therefore that the corporation was not only engaged in manufacturing, trading, and mercantile pursuits, but mining as well, and therefore subject to the provisions of the law in relation to bankruptcy, and I would accordingly recommend that an adjudication be made in favor of the petitioning creditors. No attempt has been made to discuss or distinguish the cases cited in the very elaborate and able briefs of the counsel. It has been the effort of the referee rather to shed, if possible, some light on the subject of construction to be derived from a consideration of the New York rule relative to receiverships, and the development of this section of the law as it appears in the Congressional Records and Reports.

And the evidence is herewith submitted and made a part of this report.

The following is the additional supplementary report of referee acting as master on the question of adjudication:

This petition was a second time recommitted to the referee in order that counsel on both sides might be heard upon the question originally recommitted. A hearing thereon was duly assigned and held on November 8, 1905, at 10 o'clock a. m.; Mr. Cunningham, counsel for the petitioning creditors, Mr. Stanwood, the receiver, and Messrs. Bacon and Bond, counsel for the respondent creditor, being present in court and participating in said hearing. Mr. William Dillon, one of the petitioning creditors, testified that he had never had any security, and was not guarantied the payment of his account, which had been proved at the first hearing. Mr. Charles B. Staats, of Albany, N. Y., was present in person, and testified that he was the president of the E. W. Howell Company, was conversant with the company's accounts, and that the claim of the said Howell Company was not, and never had been, secured or guarantied. Mr. Herbert White, of Brookline, Mass., the treasurer of the University Press, whose claim, as well as that of the Howell Company, had been proved at the first hearing, testified that he was familiar with the company's accounts, and that said University Press Company did not have, and never had, any security, and was not guarantied. The three witnesses were duly examined and cross-examined by counsel. I find therefore that, upon the issue originally recommitted to me, to wit, "for the purpose only of determining the question whether said claims are unsecured or not," the claims of said petitioning creditors are not, and never have been, secured, and that they were not guarantied by anybody.

And the evidence taken at said hearing is herewith submitted, and made a part of this report.

Henry V. Cunningham, for petitioning creditors.

Perkins & Stone, for alleged bankrupt.

Selden Bacon and Laurence Bond, for creditor Bainbridge W. Burdick.

DODGE, District Judge. This is an involuntary petition by three creditors, filed on June 22, 1905. No objection to adjudication is made by the alleged bankrupt, but a creditor who has obtained judgment in New York against it has filed an answer to the petition wherein he contends, among other things, that the court is without jurisdiction, because the alleged bankrupt did not have its residence, its domicile, nor its principal place of business in Massachusetts, and because it was not principally engaged in any of the kinds of business specified in section 4b of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 547 [U. S. Comp. St. 1901, p. 3423.]).

On July 8, 1905, the issues raised by this answer were referred to the referee, to ascertain the facts and report thereon. Upon his report, filed October 19, 1905, and an accompanying report of the evidence before him, there has now been a hearing. The report is in favor of the petitioning creditors, and recommends adjudication.

The referee finds that the claims of the petitioning creditors are valid and provable, that they amount to $500 in the aggregate, and are entirely unsecured. The finding that these claims were unsecured was claimed at the hearing to be unsupported by any evidence before the referee. There has been a recommittal on this question only, and on October 25th and November 9th supplementary reports have been filed, setting forth the grounds of the finding referred to, and the respondent has now withdrawn his objections to the finding. All the above findings regarding the claims of the petitioning creditors are approved.

The referee finds that on June 9, 1905, the alleged bankrupt corporation (hereinafter called the bankrupt) voted to admit, and on June 16, 1905, did admit, in writing, its inability to pay its debts and its willingness to be adjudged bankrupt on that ground. These findings are also approved. It remains only to consider those objections which deny the jurisdiction of the court.

There is no dispute that the bankrupt was a corporation organized under the laws of New Jersey, as found in the report. Its domicile therefore was not in Massachusetts. In this jurisdiction it was a foreign corporation. Within the meaning of the acts giving jurisdiction to federal courts of suits between citizens of different states, such a corporation could have no residence in Massachusetts Shaw v. Quincy Mining Co., 145 U. S. 444, 12 Sup. Ct. 935, 36 L. Ed. 768. In my opinion such a corporation cannot be said to have "resided" here within the meaning of section 2 (1) of the bankruptcy act. It cannot therefore be adjudged a bankrupt here, unless it had its principal place of business in Massachusetts for the six months preceding June 22, 1905, or for the greater part of that period.

First. The referee has found it to be a fact that the bankrupt's principal place of business and its headquarters were at Boston, within the District of Massachusetts, and the respondent contends that the finding was not warranted by the evidence.

Whatever may be the correct description, for the purposes of the question which is raised under section 4b of the bankruptcy act, and which is considered below, of the business in which the bankrupt was principally engaged, there is no dispute that its business consisted in the operation of slate quarries and slate mills and in selling the slate thus obtained or produced. Upon the evidence which accompanies the report, I find the facts below stated as follows:

(1) The quarries operated were situated either in Vermont or New York, all near the line between those states, and all within about 12 miles of Poultney, Vt. The principal slate mill was at Middle Granville, N. Y. This produced structural slate. At several of the quarries were also mills producing roofing slate, as is hereinafter more fully explained.

(2) The company was organized in May, 1902. Its officers were, and had been since its organization, a president, vice president, treasurer, secretary, and general manager. From 1902 until the filing of the petition it maintained offices in the Sears Building in Boston. These were at least its executive offices and selling agency. In them the officers above mentioned, who all, during the six months before the filing of the petition, resided in Boston, were regularly to be found and all their official business was there regularly carried on, except that the general manager spent part of his time and performed part of his duties in Poultney, as below stated. In the same offices the directors, a majority of whom resided in Boston during the same period, held all their meetings during that period. The stockbook was kept there. The minutes of the directors and the corporation books of account were kept there. Its correspondence was conducted from there. The great bulk of sales of the product of the quarries

and mills was negotiated there or from there; about 1 per cent. only of the total sales being made from Poultney. All bills for produce sold were sent out from there, being there made up from shipping slips forwarded there from Poultney. The prices of goods sold were fixed there, and the payments for goods sold received there. One regular salesman was employed, who was to be found there, except when on the road, and who was never to be found at the quarries or at Poultney. When on the road his reports were all made to the Boston office, and all orders from him were received there, but only a small proportion of the sales was made by him. From one to three clerks or stenographers were employed there in the transaction of the company's business.

(3) The principal banking of the company was done in Boston. All money received for goods sold was deposited either in the City Trust Company or the Webster & Atlas Bank, both of Boston. These were the principal bank deposits kept by the company. All notes, accounts, and bills payable were rendered to the Boston office, after being approved when necessary at other places, as below, and were paid, as a rule, by checks drawn on the above bank deposits. Such checks were drawn at the Boston office, and were there signed by the treasurer and countersigned by the president. This did not apply to the pay roll checks, further spoken of below, which were signed by the treasurer only.

(4) The company also maintained offices during the six months prior to the filing of the petition at Poultney. From there the operations carried on at its quarries and mills were directed, as below stated, subject to the supervision of the Boston office. At each quarry the company had a superintendent. Under each quarry superintendent there was a boss over each gang of men employed, whether in the quarries or mills. Weekly reports were sent from the quarries and mills to the Poultney office, from which reports of product and shipments were there made up and sent to the Boston office. All shipments were made from the Poultney office, as required to fill orders, which were ordinarily sent from the Boston office. Stock sheets showing product on hand were kept at the Poultney office. These were compared usually every month with stock sheets kept at the Boston office. For about eight months preceding the filing of the petition, in addition to the general manager above referred to, a quarry manager had been employed, who lived at Poultney and had all the active and immediate direction of all the quarries and mills, always, however, subject to the supervision and instructions of the general manager above referred to, who ordered the increase or decrease of laborers employed at the various quarries, or the making of new openings, as occasion required. The general manager made frequent visits to Poultney, at least as often as once in each month. Prior to the employment of the quarry manager, the then general manager had resided at Poultney, and there performed the duties of the quarry manager, receiving his directions regarding them from the president, at Boston. Such supplies in general as were required in operating the quarries or mills were as a

rule· purchased by the quarry manager acting from the Poultney office.  These purchases were made in New York and Vermont and to a small extent in Boston.  Bills for goods so purchased were approved by the quarry manager and sent to Boston for payment.

(5) In banks at Poultney and Granville, N. Y., funds were deposited by the company just sufficient to cover its pay roll each month. The pay rolls were made up and approved by the quarry manager at Poultney, and were then forwarded to the Boston office, where the treasurer signed the necessary checks and forwarded the required money to the Poultney and Granville banks above mentioned, to be used to cash the pay roll checks.  The general method was as above until about a year before the filing of the petition, when it was changed so far as the Poultney banks were concerned.  Objection having been made by them to paying the checks referred to because the account maintained was so small, currency to the required amount had been, during the year referred to, forwarded from the Boston to the Poultney office and the Poultney pay roll checks cashed at that office.  The deposits in the Poultney and Granville banks were chiefly, if not entirely, used for meeting the pay roll checks as stated, and the average amount allowed to remain on deposit there was at all times small in comparison with that allowed to remain in the Boston institutions.

(6) The mill and most of the quarries referred to were owned by the Mathews Slate Company, a corporation organized under the laws of Maine.  Only two of the quarries operated did not belong to that company, both of them situated in New York.  One of them was owned and one leased by the bankrupt.  The properties of the Mathews Slate Company were subject to a mortgage given by that company to the American Loan & Trust Company of Boston, as trustee, to secure an issue of bonds amounting to $500,000.  The bankrupt owned all the stock of the Mathews Slate Company, except five shares held by its directors in order to qualify them, and also owned $366,000 of the bonds issued by it, as above.  All the properties of the bankrupt, including said stock and bonds, were subject to a mortgage given by it to the City Trust Company of Boston, as trustee, to secure an issue of its own bonds, amounting to $600,000. The coupons on these bonds, due semiannually, were payable in Boston.  The money to pay them was regularly deposited as they became due with the City Trust Company, by the treasurer of the bankrupt company, at Boston.  Since the organization of the bankrupt company in 1902, and the giving of the mortgage by it as above, the Mathews Slate Company had maintained its organization under the direction of the bankrupt company, but had done no other business and had ceased altogether to operate the quarries or mills belonging to it; such operation being from that time conducted wholly by the bankrupt company.

(7) The product of the different quarries and mill was stored at or near them until shipped by direction from the Poultney office as above.  None of it appears to have been stored in Massachusetts. The property of the company in Massachusetts not already referred

to consisted of the office furniture in the Boston office only, and some samples of slate there kept. Just what property was kept at the Poultney office does not appear.

(8) From 100 to 150 men were employed at the quarries and mills referred to, not including the mill at Middle Granville, where about 10 men were usually employed.

(9) By the bankrupt's certificate of incorporation, dated May 1, 1902, it is declared that its principal office in the state of New Jersey is in Jersey City in that state. It is also provided that the corporation is to have one or more offices. It had an office in Jersey City from the time of its incorporation, at which office all stockholders' meetings were held. The stockbook was kept at the Boston office as above found. No stock transfer records appear to have been kept at the New Jersey office. It was contended by the respondent, and apparently not denied, that the New Jersey corporation laws required the keeping of all the books at that office.

The above being all the facts which seem to me material upon the question, as I find them established by the evidence, I agree with the referee that they show the bankrupt's principal place of business to have been at Boston and within this district.

The bankrupt had many places of business. Besides its New Jersey office, its Boston office, and its Poultney office, each of the quarries operated and the structural mill as well was a place at which it regularly did business. It does not seem to me that the determination of the question, which of these various places of business was the principal one, can depend upon the amount of property kept or the amount or value of product turned out or the number of men employed at each of them. It might appear that some particular quarry or the mill was principal in this sense; yet to call that particular quarry or the mill the bankrupt's principal place of business would not be in accordance with what is usually understood by that expression. Certainly, any one who desired to have business dealings with the corporation through its representatives would be more likely to go to the Poultney or to the Boston office, even though fewer employés and less property were to be found there, and no production was actually done there. If he went to the Poultney office he would do so because he would be more likely to find there some one authorized to act for the corporation regarding its quarrying and milling operations. These however, though immediately directed from Poultney, were ultimately controlled from Boston, and at Boston was also transacted a large part of the company's business with which the Poultney office had no concern, a part not less important in its relation to the business of the company as a whole than the part which was done at the quarries, the mills, or the Poultney office. The fact that the supreme direction and control over all the company's operations and dealings, and over its entire plant and property, was exercised from the Boston office, and the fact that in order to the exercise of such supreme direction and control all its operations and dealings, whether relating to production, or to sale, or to the company's finances, if not done at the Boston office, were re-

ported to that office and there passed upon by the appropriate officers, who were regularly there for the purpose of exercising such supreme direction and control, in my opinion makes the Boston office the headquarters of the company, and prevents that office from being regarded as a "mere executive office and selling agency" according to the respondent's contention. If it be said that the supreme authority lay with the stockholders, and that they met only in Jersey City, in the business of the company, their authority could only be exercised through the officers whom they elected. When elected, those officers must have been understood to be regularly performing their duties at Boston.

The facts in this case differ materially from those in the case relied on by the respondent, in Re Elmira Steel Company (D. C.) 109 Fed. 456. The headquarters of the bankrupt in that case could not be said to have been in Philadelphia. On the contrary, as is said in the opinion in Re Magid-Hope Silk Mfg. Co. (D. C.) 110 Fed. 352, "Its office in Pennsylvania seems to have been merely a branch office." The referee found that the business done in that office was less the business of the Elmira Steel Company than the business of its selling agents (109 Fed. 468), and that everything done in Pennsylvania was incidental to what was done at Elmira, N. Y. No similar finding seems to be possible in this case. It may be added that the Elmira Steel Company, organized under the laws of New York, expressly located its principal business office at Elmira by its certificate of incorporation. 109 Fed. 466. If a manufacturing company, under the circumstances shown in that case, does its manufacturing and selling in one state and its banking in another, it may well be considered, as was there held (109 Fed. 471), that it is the principal place of its principal business that must govern. I do not regard the fact that the present bankrupt did the greater part of its banking in Boston as of itself enough to make Boston the headquarters of the company. The banking done was only one of the component parts of the bankrupt's business. I consider the Boston office to have been the bankrupt's principal place of business, because all the component parts of its business were so far done at or directed from that office, as to make it proper to regard both the other offices, and each quarry, and the mill, as subordinate places of business.

Second. The referee has found that the bankrupt "was not only engaged in manufacturing, trading and mercantile pursuits, but mining as well, and therefore subject to the provisions of the law in relation to bankruptcy." The respondent contends that these findings are not warranted by the evidence. The further facts material to the question thus raised which seem to me to be established by the evidence are below stated.

(1) In the bankrupt's certificate of incorporation which has been already referred to, the objects of its incorporation are stated to be "to carry on the business hereinafter enumerated" either within the state of New Jersey or within the United States or any of its possessions or any foreign country. The description which follows is of considerable length and in terms of a very comprehensive charac-

ter. It is said in one place that the corporation is "in general to do mining and quarrying of all kinds, manufacturing of all kinds, transportation of all kinds," etc.; and the remainder of the description is so framed as to secure ample scope for the application of the general language quoted. Among other things, it is provided that the corporation is to produce mineral substances, to reduce such mineral substances to the most profitable merchantable value by appropriate processes, and "to dispose of such products by sale, exchange, or in any other way and for whatever prices it deems expedient." It is also to "manufacture, sell, or otherwise dispose of, trade in, and deal in goods, wares, merchandise, and property of every class and description, whether its own products or those of other persons, firms, or corporations, and to do so either for its own account or as agent or broker for persons or corporations."

(2) In the operation of its quarries the slate was first taken out of the quarry pits in large blocks, by drilling, blasting, and hoisting. The quarries were all of them open, as distinguished from underground excavations. The large blocks taken out were next converted either into roofing slate, to which about 85 per cent. of the product of the quarries was devoted, or structural slate, in which form the remaining 15 per cent. or thereabouts was utilized.

(3) It is necessary, in preparing roofing slate, to split the blocks as they came from the quarry promptly upon their being taken out. As taken out they can be split easily, because they then contain moisture. If this moisture is allowed to dry out of them, as it will quite rapidly under exposure to sun and air, they are split with difficulty. If not to be split at once, they are so covered as to prevent drying as much as possible. As part of the ordinary operations of slate quarrying wherever carried on, it is the method commonly practiced to split and trim the roofing slate at the quarries, and this method was followed by the bankrupt at its quarries.

(4) The blocks as taken out were first broken into lesser blocks of convenient size for handling, and then split, and the slate trimmed by revolving knives operated by foot power. At two or three of the quarries operated an improved method was used, according to which the large blocks were sawed instead of being broken. The saws used were operated by steam power, installed at the quarries for use in hoisting or similar purposes. Sheds were built over the saws, and these constituted the "roofing slate mills" which have been referred to. At such quarries as were not provided with steam power and saws, there were sheds under which splitting was carried on in the ordinary way from blocks broken instead of being sawed.

(5) After the roofing slate had been thus split and trimmed, part of it was sometimes drilled, which operation consisted in making with a machine holes for the nails to be used in attaching the slate to roofs. For slate so drilled a slightly increased price was charged.

(6) At the structural slate mill at Middle Granville, which has been referred to, suitable stock brought thither from the various quarries was converted into various forms of structural slate as required. While roofing slate was not sold by the bankrupt and is not generally sold in the rough block, slate suitable for the manufacture of struc-

tural slate is sometimes so sold. The structural slate produced by the mill formed 10 or 15 per cent. only of the annual total production of the bankrupt. About one-third of the total value of the structural slate produced was due to what was done at the mill; the other two-thirds being about the value of the mill stock as it came to the mill.

(7) In some instances the bankrupt bought slate from other producers. These purchases were in order to fill orders when the company had not the size or color required. On two occasions only it had purchased, for short periods, the entire product of other quarries.

The amount of all such outside purchases was inconsiderable in comparison with its total product.

(8) In the manufacture of its product the cost of getting out the rough blocks formed from 60 to 80 per cent. of the total cost, and the other processes from 20 to 40 per cent.

(9) The facts relating to the sale of the bankrupt's product, and its storage at or near the quarries or mill until sold, have been referred to above. At the filing of the petition the bankrupt had on hand about $80,000 worth of unsold product of the kinds described, and there was due it, in payment for product sold before that date, from $15,000 to $20,000.

The facts hereinbefore found are all the facts which seem to me material upon the question now being considered.

In so far as the bankrupt was engaged in converting the quarry blocks of slate rock into merchantable slate, whether roofing or structural slate, it was engaged in manufacturing. Notwithstanding the fact that in operating slate quarries it is usual and necessary to split the quarry blocks as soon as possible after they are taken out, I do not think that the manufacturing carried on can properly be regarded as merely incidental to the quarrying operations. Nor do I think that the bankrupt's dealings in its manufactured product can properly be considered as incidental only to its quarrying operations, any more than its processes of manufacture. It quarried only in order that it might manufacture, and it quarried and manufactured only in order that it might sell the product obtained. In its certificate of incorporation, all the different kinds of business carried on as above were expressly named among the various kinds of business to do which the bankrupt was incorporated. I do not find it necessary to decide whether or not the manufacturing and selling carried on, considered separately and apart from the quarrying operations, can properly be regarded as the business in which the bankrupt was "principally engaged." The quarrying operations were, in my opinion, "mining," within the meaning of section 4b, as amended by the act of 1903. I am unable to believe that the word "mining" is to be there understood in the strict sense contended for by the respondent, notwithstanding the fact that for many purposes "quarrying" and "mining" are to be distinguished. The construction of "mines" adopted in Midland Railway v. Robinson, 15 App. Cas. 19, is such as to include quarries or surface operations, and under this construction quarrying operations are properly included in "mining." The referee has relied upon this case, and I agree with

him in believing that the construction of the word in question which the case sanctions is more in consonance with the intention of Congress as manifested by the spirit and history of the successive enactments which have resulted in producing section 4b, as it now stands, than that for which the respondent contends. The same construction has also, as it seems to me, the sanction of an unreported decision of this court. In re Quincy Granite Quarries Company, No. 8574. In reporting on the question of adjudication, the referee in that case held that "quarrying is one of the methods of mining, and is properly included under the broader term," and held also that the alleged bankrupt, a quarrier of granite which it afterwards sold in part as quarried and the remainder after being manufactured by it, was chiefly engaged in mining and manufacturing. The referee's result was approved by the court in an opinion dated July 22, 1904, although there is no express approval of the ruling that "mining" includes "quarrying." If, as was done in Re H. J. Quinby, etc., Co. (D. C.) 121 Fed. 139, and in Re White Mountain Paper Co. (D. C.) 127 Fed. 180, 181, 182, "pursuits" in section 4b may be read in connection with the participles which precede it, and a corporation is thus subject to adjudication if principally engaged in "mining pursuits," the conclusion is further supported that a quarrying corporation is within the meaning of the section. I agree with the referee upon this question also.

His report is therefore confirmed and adjudication is ordered.