ROSZELL BROS. et al. v. CONTINENTAL COAL CORP.

(District Court, E. D. Kentucky. August 12, 1916.)

No. 1203.

1. JUDGMENT ⬤⟳498—JURISDICTION—DETERMINING QUESTION.
    The exercise of jurisdiction by a court always involves a determination that the fact or facts necessary to give it jurisdiction exist.
    [Ed. Note.—For other cases, see Judgment, Cent. Dig. § 939; Dec. Dig. ⬤⟳498.]

2. BANKRUPTCY ⬤⟳100(1)—JURISDICTION OF COURTS—CORPORATION—PRINCIPAL PLACE OF BUSINESS.
    In bankruptcy proceedings against a corporation, the fact that its principal place of business is within the district of the court is not jurisdictional, but quasi jurisdictional, and the court's determination thereof cannot be collaterally attacked, but is conclusive upon another bankruptcy court, which has not theretofore acquired jurisdiction.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 60, 142, 143; Dec. Dig. ⬤⟳100(1).]

3. BANKRUPTCY ⬤⟳11—JURISDICTION—CONFLICTING—DIFFERENT BANKRUPTCY COURTS.
    Upon bringing of bankruptcy proceeding against a corporation in a District Court, that court acquires exclusive jurisdiction of the subject-matter of the adjudication of the bankrupt as such, and the settlement and distribution of its estate, including the determination of the question as to whether or not its principal place of business is in the district of the court, and, until that court determines that it has no jurisdiction, no other bankruptcy court can acquire jurisdiction, for the filing of the first petition is a caveat to all the world, and in effect an attachment and injunc-

---
⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion, and from the time thereof the estate of the bankrupt is in the custody of the court first petitioned.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 11; Dec. Dig. ☞11.]

4. BANKRUPTCY ☞16—JURISDICTION—"PRINCIPAL PLACE OF BUSINESS" OF COAL-MINING CORPORATION—"PRINCIPAL OFFICE."

A foreign coal-mining corporation's principal place of business was in the district where its coal-mining and shipping operations and nearly all of its coal lands were, and where it had conformed to the state foreign corporation laws, and not in a district in another state where it had its head office, where its main stockholders and most of its officers and directors, who had general direction and supervision of the business, resided, where its financial business was conducted, and where it had not conformed to the state foreign corporation laws; a corporation's principal place of business not necessarily being its principal office, which latter is where its books are kept and its corporate business transacted, and which determines its residence, if in the state of incorporation.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 20; Dec. Dig. ☞16.

For other definitions, see Words and Phrases, First and Second Series, Principal Office; Principal Place of Business.]

In Bankruptcy. Petition for involuntary bankruptcy by Roszell Bros. and others against the Continental Coal Corporation, to which trustee in voluntary bankruptcy of the defendant in the District Court for the Eastern District of Tennessee and a committee of creditors filed answers. On exception to referee's finding as to principal place of business of defendant, and motion to stay proceedings. Exceptions overruled.

C. L. Williamson, of Lexington, Ky., N. R. Patterson, of Pineville, Ky., and R. A. Chiles, of Mt. Sterling, Ky., for petitioning creditors.

Moore & Darwin, of Chattanooga, Tenn., for respondent.

COCHRAN, District Judge. This is an involuntary proceeding in bankruptcy. The petition was filed May 5, 1916, and process was served May 8th on the bankrupt's statutory agent. It is a Wyoming corporation, created in 1911. Its domicile and residence, therefore, are and have always been in that state, and the only possible ground for this court having jurisdiction of the proceeding is that its principal place of business for the preceding six months, or the greater portion thereof, has been in this district. It is so alleged in the petition. On May 8th, after notice of this proceeding, the defendant filed a voluntary petition in the District Court for the Eastern district of Tennessee, alleging therein that that district had so been its principal place of business. Thereupon that court adjudged the defendant a bankrupt and appointed a receiver for its assets. Thereafter, on the 12th, answers were filed herein by the defendant and the Tennessee receiver, in which they denied, amongst other things, the allegation of the petition as to this district being the principal place of business of the defendant. They filed also a motion to stay this proceeding on the ground that the adjudication in the voluntary proceeding in the Tennessee district was conclusive as to the defendant's

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

principal place of business, and hence a bar to the further prosecution of this proceeding.

This motion was overruled, and a petition to revise my action is pending in the appellate court. At the same time the motion was overruled the issue as to the principal place of business of the defendant was referred to the referee, as special master, to hear the evidence and make a finding in regard thereto. This he has done, and his finding is that, since its incorporation, the principal place of business of the defendant has been in this district, to which the defendant and the Tennessee receiver have taken exception. In the meantime in the Tennessee proceeding the receiver therein has been appointed trustee, and he, as such, and a committee of certain creditors, appointed prior to the institution of this proceeding, have also filed answers herein, similar to those heretofore filed, and the trustee and the committee have also filed a motion to stay this proceeding on the same ground upon which the former motion was based. This cause, therefore, is before me on the exception taken to the referee's finding, and this new motion to stay.

As I still think that this court has the right to proceed herein, notwithstanding the adjudication in the Tennessee proceeding, I might do no more than overrule this additional motion to stay. But, as, since my former ruling, because of the persistency with which it is urged that I have no such right, I have gone into the matter more deeply, and, as I delivered no formal opinion on the former occasion, I avail myself of this opportunity of setting forth fully my reasons for so thinking.

The question as to the conclusiveness of that adjudication on the issue as to the principal place of business of the bankrupt may be considered in two respects. One is without reference to the possible effect thereon of the fact that at the time the Tennessee proceeding was brought and the adjudication was made therein this proceeding had theretofore been brought and was then pending. The other is with reference thereto.

[1] It may be conceded that, if it were not for this fact, the value claimed for the adjudication must be given to it. Though it was not thereby expressly determined that the principal place of business was in that district, as the District Court thereof had no power to make the adjudication unless it was, the court in making it impliedly determined that such was the case. The exercise of jurisdiction by a court always involves a determination that it has jurisdiction; i. e., that the fact or facts necessary to give it jurisdiction exist. Such being the case, the question as to whether the adjudication is subject to collateral attack on the ground that the principal place of business of the defendant corporation was not in that district depends on whether the existence thereof was strictly jurisdictional or only quasi jurisdictional. In the case of Noble v. Union River Logging Co., 147 U. S. 165, 13 Sup. Ct. 271, 37 L. Ed. 123, Mr. Justice Brown pointed out the distinction between facts that are strictly jurisdictional and those which are only quasi jurisdictional, and the effect of such distinction. As to the former he said:

"It is true that in every proceeding of a judicial nature there are one or more facts which are strictly jurisdictional, the existence of which is necessary to the validity of the proceedings, and without which the act of the court is a mere nullity."

After giving certain examples thereof, he continued:

"In these and similar cases the action of the court or officer fails for want of jurisdiction over the person or subject-matter. The proceeding is a nullity, and its invalidity may be shown in a collateral proceeding."

As to the latter he said:

"There is, however, another class of facts which are termed quasi jurisdictional, which are necessary to be alleged and proved in order to set the machinery of the law in motion, but which, when properly alleged and established to the satisfaction of the court, cannot be attacked collaterally. With respect to these facts, the finding of the court is as conclusively presumed to be correct as its finding with respect to any other matter in issue between the parties."

He then gave certain examples thereof, and characterized them as cases "where the want of jurisdiction does not go to the subject-matter or the parties, but to a preliminary fact necessary to be proven to authorize the court to act." And as to this class of cases he concluded:

"In this class of cases, if the allegation be properly made, and the jurisdiction be found by the court, such finding is conclusive and binding in every collateral proceeding."

[2] Did, then, the fact as to the principal place of business of the defendant corporation relate to the court's jurisdiction of the subject-matter of the proceedings or of the parties thereto, or did the court have such jurisdiction without reference to such fact, and was it merely a preliminary fact necessary to be alleged and proven to authorize the court to act?

Seemingly, at least, the latter was its only significance. Clearly it had no relation to the court's jurisdiction of the subject-matter of the proceeding. That court had jurisdiction of a proceeding in bankruptcy, and such was the character of the proceeding. The only possible ground for saying that it had relation to its jurisdiction of the parties thereto—i. e., the bankrupt and its creditors—is that, in view of the fact that no provision is made for notice prior to an adjudication in bankruptcy, save in an involuntary proceeding, and then only as to the bankrupt, and of the character of the notice required to be given after adjudication, it is against the principles of natural justice for jurisdiction to be exercised in bankruptcy without reference to the domicile, residence, or place of business of the bankrupt. But as the jurisdiction is in rem, the proceeding being to determine the status of the bankrupt and to settle and distribute his estate, and the jurisdiction of the federal government is as wide as its territory, it would seem that this consideration is not sufficient to cause the fact in question to relate to the court's jurisdiction of the parties. If it is not, then it is simply a preliminary fact necessary to be alleged and proved to authorize the court to act, and its determination thereof in favor of the power to act cannot be questioned collaterally. And so

it has been held. The courts in a number of cases have held that an adjudication could not be attacked collaterally as to a fact determined thereby which clearly related to the power to act and not to the jurisdiction of the subject-matter or of the parties. As, for instance, they have held that a determination thereby that the bankrupt was such an one as was subject to adjudication in bankruptcy cannot be attacked collaterally. In re Columbia Real Estate Co. (D. C.) 101 Fed. 965; Edelstein v. United States, 149 Fed. 636, 79 C. C. A. 328, 9 L. R. A. (N. S.) 236; In re First National Bank, 152 Fed. 64, 81 C. C. A. 260, 11 Ann. Cas. 355. Also that the bankrupt had committed the act of bankruptcy alleged. In re Hecox, 164 Fed. 823, 90 C. C. A. 627; In re Dempster, 172 Fed. 353, 97 C. C. A. 51.

The decision in the case of In re Elmira Steel Co. (D. C.) 109 Fed. 456, may be thought to be against the position that the determination of the principal place of business of a bankrupt, where that fact is relied on as giving the right to an adjudication, is quasi jurisdictional only. And so seems to have been the reasoning of the referee which the court approved. But two considerations prevent such an effect being given to it. One is that the adjudication relied on as a bar was a premature adjudication. It was made the day the involuntary proceeding was filed in the Pennsylvania court. The other is that the involuntary proceeding in which it was made was brought subsequently to the involuntary proceeding in New York in which it was pleaded as a bar. And both of these considerations were made much of by the referee.

The decision in the case of In re Clisdell (D. C.) 101 Fed. 246, hardly supports that position. It was there held that a creditor who had appeared and filed his proof of claim and examined the bankrupt before the referee could not be heard to claim, in opposition to the bankrupt's petition for discharge, that he had not resided within the district a sufficient length of time to give the court jurisdiction over him. But in the case of In re Hintze (D. C.) 134 Fed. 141, a dictum of Judge Lowell favors the position. He said:

"The adjudication in bankruptcy, here rendered upon a petition alleging residence, has made that residence res judicata, * * * and, as the proceeding was in rem, has determined the bankrupt's residence as against all the world."

And the decision in the case of In re Sage (D. C.) 224 Fed. 525, is squarely in point to this effect. That was a petition filed in the District Court for the Eastern District of Missouri by a trustee in bankruptcy, appointed in an involuntary proceeding pending in the District Court for the Southern District of Iowa, against a receiver, appointed in a proceeding in a court of the state of Missouri, to compel the latter to turn over to him certain assets of the bankrupt in his possession. The petition was sustained. Amongst other reasons urged against it was that the bankrupt did not have his principal place of business, residence, or domicile in the Southern District of Iowa. Judge Dyer, as to this, said:

"As the pleadings showed the requisite jurisdictional fact as to domicile, the adjudication made thereon cannot be questioned collaterally."

The decision of the Supreme Court of the United States in the recent case of Fairbanks Steam Shovel Co. v. Wills, 240 U. S. 642, 36 Sup. Ct. 466, 60 L. Ed. 841, may be thought to conclude the question. That case involved a contest between a trustee in bankruptcy, appointed in an involuntary proceeding in the Southern district of Illinois, and a mortgagee, as to the validity of its mortgage on a floating steam dredge owned by the bankrupt. The bankrupt was an Illinois corporation. Its principal office was in Cook county, Ill., in the Northern district thereof. It had possession of and was using the dredge in Cass county, in the Southern district thereof. The statute of Illinois required mortgages to be recorded in the county where the mortgagor resides. It was held that the mortgage was invalid, because not recorded in Cook county, where the bankrupt's principal place of business was, and where, therefore, it resided. The mortgagee urged that, if the mortgage was invalid for this reason only, the adjudication in bankruptcy and the appointment of the trustee were void also. The bankruptcy proceeding should have been instituted in the District Court for the Northern District of Illinois, and not in that of the Southern District. The Seventh Circuit Court of Appeals responded to this position that it related to the trustee's capacity to sue, and, as it had not been pleaded, it would not be considered. Possibly a sufficient answer was that, though the residence of the bankrupt was in Cook county, where its principal office was, its domicile was in every part of the state, or, its principal place of business was in the Southern district of Illinois, and hence the District Court thereof had jurisdiction of the proceedings. The answer of the Supreme Court, through Mr. Justice Pitney, was in these words:

"It is insisted that the adjudication of bankruptcy was invalid, and that the trustee had no capacity to sue. But the adjudication is not open to collateral attack, and the question of capacity was waived because not raised in the trial court."

I proceed, therefore, upon the idea that the position is sound, if the matter of the conclusiveness of the adjudication by the Tennessee court on the issue as to the principal place of business of the bankrupt is considered without reference to the possible effect thereon of the fact that at the time that proceeding was brought and the adjudication therein was made this proceeding had theretofore been brought and was then pending, it is conclusive that it was in the Tennessee district and that the adjudication is not subject to collateral attack.

[3] How does this matter stand with reference thereto? Did that fact make any difference as to the conclusiveness thereof in regard thereto, at least, so far as this proceeding is concerned? I think it clear that it did, and that, so far, that adjudication is an absolute nullity. This is for the reason that upon the bringing of this proceeding this court acquired exclusive jurisdiction of the subject-matter of the adjudication of the bankrupt as such and the settlement and distribution of its estate, which included the determination of the question as to whether or not its principal place of business was in this district, and hence that the Tennessee court was without any jurisdiction thereof whatever, so long as this court had not determined ,

that its principal place of business was not therein. If this proposition is sound, of course, it must be conceded that that adjudication is an absolute nullity, at least so far as this court is concerned, and is not in the way of its proceeding to determine the issue as to the bankrupt's principal place of business on its merits. I will now endeavor to show that it is sound.

It is possible for the District Courts of at least three federal districts to have concurrent jurisdiction of a bankruptcy proceeding as to a natural person. Such is the case if his domicile is in one district, residence in another, and principal place of business in a third. The District Court of each of these districts has jurisdiction of a bankruptcy proceeding as to him, and this jurisdiction is concurrent. In the case of a corporation, it is possible for the District Courts of at least two such districts to have jurisdiction as to it. This would be the case if its domicile and residence were in one and its principal place of business in another; and, if it is possible for its domicile and residence to be in different districts, it is possible for the District Courts of at least three districts to have such jurisdiction as to it, the same as in the case of a natural person. Bankr. Act July 1, 1898, c. 541, § 32, 30 Stat. 554 (Comp. St. 1913, § 9616), and General Order No. 6 (89 Fed. v), have made provision, in part at least, for the course of procedure in such a case of concurrent jurisdiction. They provide, as I take it, that the first hearing shall be had in the district in which the debtor has his domicile, and, if the court adjudges him a bankrupt, then it is for it to determine whether the greatest convenience of the parties in interest requires that another of the courts having concurrent jurisdiction should proceed with the cases, and, if it so determines, to order them to be transferred to that court. Suppose such concurrent jurisdiction existed, and not only no such provision, but no provision whatever was made for the course of procedure in such a case, how would the matter stand? Resort would have to be had to general principles of jurisprudence to find a rule to govern it, and they would yield one.

It is a general principle that, if two courts have concurrent jurisdiction of certain property, the exercise of which involves the taking possession and disposing of such property, the first court appealed to has exclusive jurisdiction thereof, and the other court is without power to interfere therewith. It results from the consideration that both courts cannot at the same time take possession and dispose of it. One or the other must yield. And it is reasonable that the one last appealed to should give way to the first. There may be the limitation upon this principle laid down in the recent case of Empire Trust Co. v. Brooks (C. C. A.) 232 Fed. 641; but I am not concerned here to determine whether there is such a limitation. This general principle finds frequent application in cases of concurrent jurisdiction by courts of bankruptcy and the state courts. The Bankruptcy Act and General Orders make no provision for such a case of concurrent jurisdiction, and the matter is left to be determined by the general principles of jurisprudence. And it is well settled that, if the proceeding in bankruptcy is begun first, the state court is ousted absolutely of all

jurisdiction over the property pending the proceeding. Immediately upon the filing of the bankruptcy petition the property of the bankrupt not adversely held is in the potential possession of the bankrupt court, in custodia legis, as the saying is; and it is immaterial whether such property is located in the district where the bankruptcy proceeding is pending or in another district. In Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, Mr. Chief Justice Fuller said:

"It is as true of the present law as it was of that of 1867 that the filing of the petition is a caveat to all the world, and in effect an attachment and injunction (Bank v. Sherman, 101 U. S. 403, 25 L. Ed. 866), and, on adjudication, title to the bankrupt's property becomes vested in the trustee (sections 70, 21e [Comp. St. 1913, §§ 9654, 9605]), with actual or constructive possession, and placed in the custody of the bankruptcy court."

This was at one time taken to involve the right of such court to send its process into other districts where the bankrupt property may be located to protect its custody, and hence there was no necessity for, and no such thing as, ancillary jurisdiction in the District Courts of such other districts. In re Granite City Bank, 137 Fed. 818, 70 C. C. A. 316; In re Dempster, 172 Fed. 353, 97 C. C. A. 51.

But the Supreme Court held otherwise in the case of Babbitt v. Dutcher, 216 U. S. 102, 30 Sup. Ct. 372, 54 L. Ed. 402, 17 Ann. Cas. 969. There was, however, no taking back to any extent of the position that, immediately upon the filing of the petition in bankruptcy, the property of the bankrupt, wherever situated, within the territorial limits of the United States, passes into the custody of the court of bankruptcy in which it was filed, and that the effect of the filing thereof is an attachment and injunction, and that everywhere in the United States. Upon the appointment of the trustee the title to such property, as of the date of adjudication, passes to him, and that court has power to provide for its sale and conversion into money. Robertson v. Howard, 229 U. S. 254, 33 Sup. Ct. 854, 57 L. Ed. 1174. And the courts of bankruptcy in the districts where the property is situated have ancillary jurisdiction to protect the custody thereof by the court of bankruptcy of the primary jurisdiction. The latter has to rely on the former to protect its custody and to enable it to acquire actual possession. Babbitt v. Dutcher, supra. There may be an inconsistency in the position that a bankruptcy court may have the custody of property, and the filing of a petition in bankruptcy therein has the effect of an attachment and injunction beyond the territorial jurisdiction of such court, and the position that it has no power to issue its process beyond its territorial jurisdiction to protect its custody, but must depend on the bankruptcy court where the property is situated for that, but I am not concerned to think this matter out. It is judicially settled that both positions are sound.

Such being the case, it follows that any action taken by a state court in relation to such property, which, otherwise, it would have jurisdiction to take, would be beyond its jurisdiction and an absolute nullity, and that whether the state court taking the action was within the territorial limits of the court of bankruptcy of primary jurisdiction or outside of it. In the case of Murphy v. John Hofman Co., 211 U. S.

562, 29 Sup. Ct. 154, 53 L. Ed. 327, which involved a conflict between a court of bankruptcy and a state court, Mr. Justice Moody said:

"Where a court of competent jurisdiction has taken property into its possession, through its officers, the property is thereby withdrawn from the jurisdiction of all other courts."

And again:

"The jurisdiction in such cases arises out of the possession of the property and is exclusive of the jurisdiction of all other courts, although otherwise the controversy would be cognizable in them."

Note the statement in the one case, "The property is thereby withdrawn from the jurisdiction of all other courts," and in the other, "The jurisdiction * * * is exclusive of the jurisdiction of all other courts." It is true that in that case the court of bankruptcy had the actual possession of the property, and the statements are limited to cases of actual possession. But the same principle applies with just as much force where the possession is merely potential.

The case of Acme Harvester Co. v. Beckman Lumber Co., 222 U. S. 300, 32 Sup. Ct. 96, 56 L. Ed. 208, involved an attachment of the bankrupt's property in a suit brought in a state court of Missouri, instituted after the filing of the petition in bankruptcy in Illinois. It was held that the attachment would have been invalid, had not the petition in bankruptcy been practically dismissed before the attachment was sued out. Mr. Justice Day said:

"An attachment of the bankrupt's property after the filing of the petition and before adjudication cannot operate to remove the bankrupt's estate from the jurisdiction of the bankruptcy court for the purpose of administration under the act of Congress. It is the purpose of the bankruptcy law, passed in pursuance of the power of Congress to establish a uniform system of bankruptcy throughout the United States, to place the property of the bankrupt under the control of the court, wherever it is found, with a view to its equal distribution among the creditors. The filing of the petition is an assertion of the jurisdiction with a view to the determination of the status of the bankrupt and a settlement and distribution of his estate. The exclusive jurisdiction of the bankruptcy court is so far in rem that the estate is regarded as in custodia legis from the filing of the petition. It is true that under section 70a of the act of 1898 [Comp. St. 1913, § 9654] the trustee of the estate, on his appointment and qualification, is vested by operation of law with the title of the bankrupt as of the date he was adjudicated a bankrupt, but there are many provisions of the law which show its purpose to hold the property of the bankrupt intact from the time of the filing of the petition, in order that it may be administered under the law if an adjudication in bankruptcy shall follow the beginning of the proceedings."

And in the case of Lazarus v. Prentice, 234 U. S. 263, 34 Sup. Ct. 851, 58 L. Ed. 1305, where persons claiming property of the bankrupt were not allowed to intervene in ancillary proceedings in Louisiana, but required to assert their claim in New York, where the bankruptcy proceeding was pending, Mr. Justice Day said:

"The filing of the petition and adjudication in the bankruptcy court in New York brought the property of the bankrupts, wherever situated, into custodia legis, and it was thus held from the date of the filing of the petition, so that subsequent liens could not be given or obtained thereon, nor proceedings had in other courts to reach the property, the court of original jurisdiction having acquired the full right to administer the estate under the bankruptcy law."

And again:

"The property when seized was by virtue of the terms of the bankruptcy act held for and to be turned over to the court of original jurisdiction, and no right could be acquired in it by assignment subsequent to the filing of the petition which would defeat this purpose. Such assignment was a mere nullity, properly disregarded by the bankruptcy court, and notwithstanding which it could direct the delivery of the bankrupts' property to the receiver by summary process."

A striking instance of the absolute nullity of proceedings in the state court, initiated during pendency of the bankruptcy proceedings, may be found in a case arising under Act March 2, 1867, c. 176, 14 Stat. 517, to wit, that of Phelps v. Sellick, Fed. Cas. No. 11,079. There a suit to foreclose a mortgage was brought in the state court, and decree of foreclosure and sale therein was had, after the filing of the petition in bankruptcy. It was held that those proceedings were a nullity and the action of the mortgagee in bringing and prosecuting the suit a contempt of the bankruptcy court.

If, then, in such a case concurrent jurisdiction, where neither the Bankruptcy Act nor the General Orders contain any provision covering the situation, the court of bankruptcy, if first appealed to, would have exclusive jurisdiction, and the state court would be so absolutely without jurisdiction to proceed that anything it might do would be a nullity, in a case of concurrent jurisdiction of two or more courts of bankruptcy, if neither the Bankruptcy Act nor the General Orders contained any provision covering the situation, the same rule would apply. Each proceeding involves the taking possession and disposing of the bankrupt's estate. In the nature of things, two such courts cannot do this at the same time. One or the other must give way, and it is reasonable that the one last appealed to should give way to the first. The filing of the first petition here, as always, is a caveat to all the world, and in effect an attachment and injunction, and from the time thereof the estate of the bankrupt is in the custody of the court where that takes place. And another court of bankruptcy, as well as any other court, is affected by this condition of things.

There is another case of concurrent jurisdiction in bankruptcy, and one for which neither the Bankruptcy Act nor the General Orders make any provision, of which note should be taken, in passing, to point out that, whatever should be the rule applicable thereto, it is without significance here. It is where an involuntary petition is filed, and thereafter a voluntary petition is filed by the bankrupt in the same court. A number of such cases are found in the Federal Reporter. Such are the cases of In re Dwyer (D. C.) 112 Fed. 777; In re Stegar (D. C.) 113 Fed. 979; Gleason v. Smith, Perkins & Co., 145 Fed. 895, 76 C. C. A. 427; In re New Chattanooga Hardware Co. (D. C.) 190 Fed. 241; In re Lachenmaier, 203 Fed. 32, 121 C. C. A. 368. Generally, in these cases, the order of procedure has been thought to be determinable by practical considerations. It has not occurred to the court that the matter was affected by the fundamental general principle to which I have referred, and how, consistently therewith, it could proceed in the subsequent voluntary proceeding with the involuntary

proceeding pending, except probably in the case of Gleason v. Smith, Perkins & Co., where it was held that the adjudication did not invalidate the prior involuntary one. But the fact that in such a case the two proceedings are pending in the same court keep these decisions, which are more relied on by the defendant, from having any bearing whatever on the question we have here, and no further notice need be taken of them.

If, then, this were a case of concurrent jurisdiction on the part of this court and the Tennessee court, and neither the Bankruptcy Act nor the General Orders contained any provision determining the courts to pursue, it would have to be held that upon the filing of the petition herein this court acquired exclusive jurisdiction of the matter of adjudging the defendant corporation a bankrupt and settling and distributing its estate, and the Tennessee court was without any jurisdiction whatever to proceed. There is no escaping from this. But this is not a case of concurrent jurisdiction. This court and the Tennessee court do not each have jurisdiction to adjudge the defendant corporation a bankrupt and to settle and distribute its estate. This is so because, as its domicile and residence was in the district of neither court, but in that of the state of Wyoming, the only possible ground for either having jurisdiction is that its principal place of business was in its district. And this could have been in but one of the two districts. As it is not a case of concurrent jurisdiction, neither the Bankruptcy Act nor the General Orders contain any provisions as to the course of procedure. That must be determined in accordance with general principles.

Why, then, does not the same rule apply here as would apply if it were a case of concurrent jurisdiction and section 32 of the Bankruptcy Act and General Order No. 6 did not exist? Just the same, as in that case the filing of the petition herein would have been, it was a caveat to all the world, and in effect an attachment and injunction, and brought into the custody of this court the entire estate of the bankrupt wherever situated. The only difference between the two cases is that in that case there would be no question as to this court having jurisdiction, whereas here there is a question in regard thereto. There is a possibility that it is without jurisdiction. But there is an equal possibility that it alone has jurisdiction. Certainly, if as a matter of fact the latter alternative is true, its jurisdiction is exclusive, and the Tennessee court is without jurisdiction to proceed. It would be strange indeed that such would be the case if it had jurisdiction concurrently with the Tennessee court, and neither the Bankruptcy Act nor the General Orders contained a provision as to the course of procedure, and not be the case if it alone has jurisdiction. And, if in fact it has no jurisdiction, that being in the Tennessee court, still it has jurisdiction to determine whether it has jurisdiction. It was because of the fact that the Tennessee court had jurisdiction to determine its jurisdiction that I have acceded to the position that, leaving out of consideration the fact that this proceeding was pending when

the Tennessee proceeding was instituted, its adjudication would be conclusive as to the bankrupt's principal place of business, and not subject to collateral attack. Having such jurisdiction, it must be exclusive.

In the case of McAlister v. Chesapeake & Ohio Ry. Co., 157 Fed. 740, 85 C. C. A. 316, 13 Ann. Cas. 1068, it was held that in a removal case the federal court acquired jurisdiction, at least for the purpose of determining whether the removal proceedings vested jurisdiction of the cause in it, and, as ancillary to such jurisdiction, might enjoin the plaintiff from proceeding in the state court until it could hear and determine the question of its own jurisdiction. And, as held in the case of Mueller v. Nugent, the effect of the filing of a petition in bankruptcy is both an attachment and an injunction, and such is its effect, as much so if it should turn out that the court in which it is filed is without jurisdiction as if it should turn out that it had jurisdiction. And the injunction operates as much against the prosecution of a bankruptcy proceeding as any other proceeding where it is not specifically authorized.

I therefore conclude that upon the filing of the petition in this court it acquired exclusive jurisdiction of a proceeding in bankruptcy as to the bankrupt, and at the time of the adjudication in the Tennessee court it was without jurisdiction to make it, and hence, at least so far as this court is concerned, the adjudication and all subsequent proceedings in that court were nullities. The prosecution of the voluntary proceeding in the Tennessee court was, baldly speaking, in fact, though unconsciously so, in contempt of the jurisdiction and authority of this court. And what this court is asked to do by the motion to stay is to ignore this contempt. I have said nothing against the right to file the voluntary petition in the Tennessee court, so that it may be proceeded with, if it should turn out that this court is without jurisdiction, and have only held that there was no right to prosecute it pending the proceeding in this court.

[4] I proceed next to dispose of the exception to the referee's report, and to determine whether the principal place of business of the bankrupt was in this district or in that of the Tennessee court. It is certain that it was in one or the other. In order to do this the nature of its business, and how and where it did it, should be fully and accurately set forth. The bankrupt's charter has not been filed, but it is stated by the referee in his report that it seemed agreed that the business which it called for was that of owning and holding coal lands and mining and shipping and selling coal. Its coal lands contained about 19,000 acres, of which about 17,000 are in Bell and Knox counties, Ky., in this district, about 16,000 in Bell and 1,000 in Knox, and the remaining 2,000 in Van Buren county, Tenn., in the Eastern district thereof. Possibly all this acreage is not coal land. The Tennessee land has never been developed. It has mined the Kentucky acreage extensively, mainly in Bell county. It has had in operation there 10 mines, and has mined and sold therefrom, on an average, over 600,000 tons per year. It has also owned and operated in close

proximity to the mines four commissaries, at which it has sold merchandise to its employés and the public generally. These sales have averaged $325,000 per year. In addition it has been selling timber from its lands, the sales of which have amounted to $25,000 to $40,000, and numerous portions of its lands in small tracts and town lots. The mining and shipping of the coal and all sales of merchandise, timber, and lands have all taken place in Bell county. The purchase of all supplies for the mines, and of all merchandise for the commissaries, have likewise been done there. It has had an office in Bell county, and the detailed account of all these transactions have been kept in its books there. It has had in its employ, in connection with all these matters, more than 1,000 men, possibly as many as 1,200 or 1,300, mainly miners. These employés have lived, mainly, in houses on its lands near the mines, of which there are more than 500, for which they have been charged rent. Until June 5, 1915, all these matters were under the immediate supervision and direction of its vice president and general manager, who lived and had his office in Bell county. He was succeeded on that date by the chairman of an executive committee of three, appointed to bring about a more efficient operation of the business of the company, who has also resided or had his office in that county. Its entire assets, outside of the 2,000 acres in Tennessee and certain office furniture in its office at Chattanooga, Tenn., in the Eastern district thereof, shortly to be described, are in this district. There is a mortgage indebtedness on the real estate to cover bonded indebtedness of $2,000,000, and it owes in unsecured debts possibly as much as $1,000,000.

Its head office has been at Chattanooga, and consists of three rooms in the twelfth story of a skyscraper. Its main stockholders, all its directors and officers, except the vice president and general manager, and the chairman and another member of the executive committee, have resided there. The office is occupied by its president, secretary and treasurer, and sales manager, each possibly having a room to himself, who have given their entire time to the bankrupt's business. It has had two or three stenographers there, possibly one for each officer. The board of directors have met there. The officers have exercised general supervision over the business and given directions in regard thereto. It has been under their general supervision and direction that it has been carried on. Communications between them and those in charge at the mines have been had by mail and a telephone line, of which they had the exclusive use, at first for an hour, afterwards for three quarters of an hour, each day. Reports were regularly made to them by those in charge at the mines. The financial business of the bankrupt may be said to have been conducted at the Chattanooga office. The money borrowed was borrowed there. Its principal bank account was kept in Chattanooga. Probably the major portion of its unsecured indebtedness is owed there. Payment for all purchases made on its behalf were made by checks on this bank account. The checks for same were made out at the mines and sent to the Chattanooga office to be countersigned. It does not appear

where the checks were mailed from to the debtors. The amounts of the regular pay rolls were sent to the Chattanooga office, and it caused the money to be sent to a bank in Bell county by a Cincinnati bank. No bookkeeping was done at the Chattanooga office, except the keeping of what is termed the general accounts. These seem to have been kept by the secretary and treasurer. Agencies for the sale of its coal were maintained at Atlanta, Ga., Knoxville, Tenn., Danville, Ky., Louisville, Ky., and Chicago, Ill. It has operated coal yards at Louisville, Ky., at first directly, and afterwards through a corporation whose stock it owned.

Reference is made in the evidence to traveling salesmen. It might have been made clearer than it was just where they came in. It would have been well, had counsel made this plain, rather than take time to introduce in evidence so much irrelevant stuff as they did. Possibly these traveling salesmen were its agents stationed at those several points, or they may have operated independently of them. All orders for coal were sent to the Chattanooga office. They were passed on by the sales manager, and, if accepted, copies thereof were sent to the office at the mines to be filled, and remittances for coal purchased were made to the Chattanooga office and deposited in the bank there. It has sold a great deal of coal bought from other concerns, with which the Kentucky operations had nothing to do. The extent of this, and when it was sold, might have been made more definite. The bankrupt had complied with the requirements of the Kentucky statutes as a prerequisite of its right to do business therein, but had not complied with the requirements of the Tennessee statute.

Such, then, are the facts from which it is to be determined where the principal place of business of the bankrupt was, and I proceed now more directly to a consideration of that question. It is to be noted, in the first place, that the question is, where was the bankrupt's principal place of business? and not where its stockholders, directors, and officers lived. Again it is to be noted that the question is where was the bankrupt's principal place of business, and not where was its principal office? The bankrupt act says principal place of business, and not principal office. The principal office of a corporation may be of significance in determining where it resides, but it is not of significance in determining its principal place of business. The principal office of a corporation is where its books are kept and its corporate business transacted. In the case of Galveston, H. & S. A. R. Co. v. Gonzales, 151 U. S. 496, 14 Sup. Ct. 401, 38 L. Ed. 248, Mr. Justice Brown said:

"In the case of a corporation, the question of inhabitancy must be determined, not by the residence of any particular officer, but by the principal offices of the corporation, where its books are kept and its corporate business is transacted, even though it may transact its most important business in another place."

Of course, this is subject to the qualification that, for a corporation's inhabitancy to be so determined, its principal office must be in

the state of its incorporation. It cannot have inhabitancy or residence elsewhere. The Bankruptcy Act contemplates residence and principal place of business as distinct conceptions. In the case of corporations, principal office, in the state of incorporation, determines residence. To allow it a hand in determining the principal place of business of a corporation is to confuse the two conceptions.

Still again it is to be noted that the words "principal place of business" imply that there may be more places of business than one, and call for the principal—i. e., the most important—of such places. This would indicate that what is had in mind is a place where business is actually done or transacted, rather than a place from which business is supervised, directed, or controlled. For, whilst persons often do or transact business in more places than one, they rarely, if ever, supervise, direct, or control it from more than one place. And a comparison of the place where business is done or transacted with the place from which it is supervised, directed, or controlled, to determine as between them which was the more important, could hardly have been intended. If such is the case, then, in determining where the bankrupt's principal place of business is, the places where it did or transacted business should be compared, and not such place and that from which it supervised, directed, and controlled it. Suppose, for instance, a person owns and operates a large department store in Cincinnati, Ohio, at which all purchases or sales are made, but lives in Covington, Ky., and has an office there, from which, by means of a telephone connection, he supervises, directs, and controls the business, no one would contend that his principal place of business was in Covington, and not in Cincinnati.

And still further it would seem that what is had in mind is not any business, but only such as is of an ultimate character. The act of 1867 fixed the district in which the debtor has "resided or carried on business" as that in which bankruptcy proceedings could be instituted. In the case of In re Alabama & C. R. R. Co., Fed. Cas. No. 124, which arose under that act, the question was whether an Alabama corporation, which owned and operated a railroad in Alabama, Georgia, Mississippi, and Tennessee, but had an office in New York City, where its officers acted and its board of directors met, and where it contracted debts and made loans, purchases, and payments, could be said to have carried on business in New York City, in the meaning of the Bankruptcy Act, so as to give the District Court of the Southern district of New York jurisdiction of an involuntary proceeding in bankruptcy against it, and it was held that it could not. I quote rather extensively from Judge Woodruff's opinion, because of the persuasiveness of his reasoning. He said:

"Do the facts here show that the corporation, the alleged debtor, carried on business in this district, within the meaning of the said eleventh section of the bankrupt law? In its broadest sense, the term 'business' includes nearly all the affairs in which either an individual or a corporation can be actors. Indulgence in pleasure, participation in domestic enjoyment, and engagement in the offices of merely personal religion, may be exceptions, in the case of an individual. But the employment of means to secure or provide for these

would, to him, be business; and, to a corporation, these exceptions can have no application. The conduct of any and all of the affairs of a corporation is business. Does, then, the doing of any acts whatever pertaining to the affairs of a railroad corporation constitute 'carrying on business,' in the sense of the act? Has the term, 'carrying on business,' the same meaning as 'transacting any of its business'? If the necessities or interests of a railroad company require that an agent should be sent to a timber region to purchase or otherwise procure (e. g., by cutting, sawing, etc.) materials for its superstructure, is that carrying on business there? If it send an agent or agents to a city, the center of capital, to negotiate its bonds and raise money in aid of the construction of its road, and such agency be continued for that purpose, and for receiving subsequent remittances and making payments of interest or other indebtedness, at an office provided therefor, is that carrying on business in such city, within the meaning of the act? I am constrained, not only by considerations already suggested, but by what, upon the words themselves, should be deemed their proper interpretation, to answer these questions in the negative. There are, in the carrying on of a business, many affairs which are merely incidental, and which may be, and often are, transacted elsewhere than at the place where the business—that which is the real design and purpose or object in view—is located; and such transactions may be of such frequent, or even daily, occurrence as to require an agency of considerable duration. It would seem to me greatly unjust and unreasonable to regard such transactions as a carrying on of business, in the sense of the law. 'Carrying on business' looks to the scheme and purpose to which such transactions tend, and not to the incidental transactions themselves. Thus the business of a railroad corporation is, by its charter, the construction, maintenance, and operation of a railroad. That is its business. In aid thereof, it may be necessary or expedient to employ agents and agencies—since it can only act by agents—in other places than those in which its business of constructing, maintaining, and operating the road can be done. But the transactions of such agents are only collateral or incidental. They do not, in a just sense, constitute the business of the railroad company. That business cannot be removed. The company itself cannot transfer it. Agents, or officers who are agents, and only agents, may, from a distance, advise therein, give rules or directions to other agents for its management, but the business of the railroad company can only be done where the railroad is, or is to be, constructed, maintained, and operated."

There is no reason to think that the word "business" in the present act has any different meaning from what it had in the act of 1867. The change in provision was brought about, no doubt, by the consideration that a person might carry on business in several districts in the meaning thus given to that word, and it was desired to limit the jurisdiction of bankruptcy proceedings to the district which was the principal place of so doing. Here the ultimate business of the bankrupt was mining and selling coal. That was the scheme and purpose to which all its transactions tended. Everything else that it did was merely incidental thereto. If this restricted meaning is to be given to the word "business" in the present act, then all that is to be considered in determining its principal place of business is, where did it mine and sell its coal; and if it mined and sold in different places, which of these was the principal? All the rest of the business transacted by it was merely incidental thereto. It seems to me that this is the true view of the matter. As the referee in the case of In re Elmira Steel Company, supra, expressed it, it is the "principal place of the principal business" that determines jurisdiction.

Where, then, did the bankrupt mine and sell its coal, and, if it did the one in this district and the other in the Tennessee district, which of the two was the principal or the most important? It is certain that its entire mining was done in this district. It is not so certain that it can be said that it did any selling of coal in the Tennessee district, except at Knoxville. And the evidence is that very little coal was sold there. If it is to be said that any of the coal actually sold at its several agencies and by its traveling salesmen were sold at its head office, this was constructively so only. But, take it that all its coal was sold there, how does the matter stand? I leave out of consideration any coal that may have been bought from other concerns. It cannot be said that any of it was sold within six months preceding the filing of the petition herein. It may be thought that there are no considerations for determining whether the mining or the selling end of the bankrupt's business was the principal. Neither could get along without the other. If 'no coal was mined, there would be none to sell. And if no coal was sold, the bankrupt would soon run short of money to pay for the mining. The only possible considerations which occur to me favor the mining end. The mining came first. The operations in connection with the mining were of much greater magnitude than those in connection with the selling. Where the mining was, there were its assets in the main. The mining was actual, whereas the selling, so far as the Tennessee district was concerned, was constructive only. But in this line of reasoning I cannot help but feel that I am bordering on the unreal, if not actually in it. It would seem that the comparison to be made in determining the principal place of business is not between successive, but parallel, business operations. In case of successive business operations, no comparison is to be made; but it is the more prominent feature thereof which gives name to the business that is determinable. A merchant both buys and sells. But it is the selling end that is the prominent feature of his business and is expressed in his name. In the case of a manufacturer or mine operator, he produces and sells. But it is the production end of his business that is the prominent feature, and is expressed in his name. No one ever speaks of a manufacturer or mine operator as a merchant or seller of goods, but always as a manufacturer or mine operator.

The discussion, then, comes to this: Within the meaning of the act, the place of business of a merchant is at his store, of a manufacturer at his factory, and of a mine operator at his mine. If the merchant has but one store, such is his principal place of business. It can never be anywhere else. So if the manufacturer has but one factory, such is his principal place of business. It can never be anywhere else. And so if a mine operator has but one mine, such is his principal place of business. It can never be anywhere else. It is only in case the merchant has more than one store, the manufacturer more than one factory, or the mine operator more than one mine, or a person follows two or all three of these occupations, that any occasion arises for a comparison of places of business to determine which is the principal, i. e., the most important, or of greatest consequence; and then

the comparison is between the two stores, two factories, or two mines, or the several occupations, as the case may be. This would seem to be the common-sense view of the matter. And it has the merit of simplicity and reality. It avoids a comparison between the main object and that which is directed to it and essential to its accomplishment, between directing a thing to be done or supervising its doing, and the doing of it, and between successive main operations, each of which is essential to the other, to determine which is the most important or of greatest consequence. Such comparisons raise questions of like order to that as to how many angels can stand on the point of a needle.

As, then, all the mining of the bankrupt was done in this district, it must be held that it was its principal place of business. Two considerations strengthen this conclusion: One is that such seems to have been the bankrupt's view of the matter before any trouble arose. This is to be gathered from the fact that it saw fit to comply with the conditions prescribed by the statute of Kentucky as a prerequisite to its right to do business therein, and not to comply with those prescribed by the statute of Tennessee. It is true, as held in Re Duplex Radiator Co. (D. C.) 142 Fed. 906, and In re Perry Aldrich Co. (D. C.) 165 Fed. 249, that the circumstance that the bankrupt had not complied with the Tennessee statute does not change the fact that its principal place of business was in that state, if such, indeed, was the case. But the circumstance that it complied with the one statute and not with the other is not without bearing on what the bankrupt deemed was its principal place of business, and that has a tendency to show what was in fact its principal place of business.

It is urged that it was affected by the consideration that the requirement of the Tennessee statute was more burdensome than that of Kentucky. It is not, however, shown just how more burdensome it was. This may have had something to do with its action. But it remains that it deemed the business done in Kentucky of sufficient importance to comply with its statute, and did not deem that done in Tennessee sufficient to comply with its statute.

The other consideration is that in the argument here on behalf of defendant the matters stressed are that the bankrupt's stockholders, directors, and officers lived in Tennessee, that its headquarters or principal office was in that state, and that its entire affairs were supervised, directed, and controlled therefrom. But little is said as to anything else which it did therein. All these considerations I have ruled out as without bearing on the question as to where the bankrupt's principal place of business was.

The authorities on the subject, which are so close to this case in their facts as to be pertinent, are not numerous. Those tending to support plaintiff's position are the cases of In re Elmira Steel Co., supra; In re Tygart's River Coal Co. (D. C.) 203 Fed. 178; Home Powder Co. v. Geis, 204 Fed. 568, 123 C. C. A. 94. That mainly relied on by the defendant is the case of Matthews Consolidated Coal Co., 144 Fed. 737, 75 C. C. A. 603, affirmed in Burdick v. Dillon, 144

Fed. 737, 75 C. C. A. 603.  It must be conceded that the opinions in this case emphasize features which are emphasized here, and perhaps the conclusion reached was determined by them.  But, as noted by the referee, the question there arose under the stress of the fact that it was not an issue between two District Courts, as here, but upon the objection to the jurisdiction made by a creditor who sought to defeat the bankruptcy proceeding in order that a lien acquired by him in the state of New York might be effective, and its plants seem to have been so nearly equally divided between New York and Vermont as to render difficult the determination in which the greater portion thereof were.

The referee has handled the question so well in his opinion that I might have contented myself with merely adopting his reasoning; but I have deemed it best to present it in my own way, thinking that possibly I might be able to do so in such a way as to reconcile the defendant to the inevitable.

The exceptions to the referee's report are overruled, and it is affirmed.