CONTINENTAL COAL CORP. et al. v. ROSZELLE BROS. et al.

(Circuit Court of Appeals, Sixth Circuit.   June 6, 1917.)

No. 3047.

1. BANKRUPTCY ⬤⇒16—JURISDICTION OF PROCEEDINGS—PRINCIPAL PLACE OF BUSINESS OF CORPORATION.

   A corporation was engaged in extensive mining operations in B. coun-ty in the Eastern District of Kentucky, where it maintained four com-missaries, selling to employés and the general public, and employed about 1,000 men, renting and living in its houses, numbering more than 500. The maps and original deeds of its property were kept in a vault there prepared for the purpose, its superintendent and manager resided there, and the mining and shipment of coal and sales of merchandise, timber, and lands, and the purchase of equipment and supplies had all been had there exclusively. It maintained its principal office in Chattanooga, where most of its officers resided and where its books were kept, the gen-eral guidance of its business effected, and the selling of coal, including

some bought by it from other producers done. *Held*, that its principal place of business was in the Eastern District of Kentucky, and the Dis-Court for that district had jurisdiction of a bankruptcy proceeding against it.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 20.]

2. BANKRUPTCY ☞467—REVIEW—QUESTIONS OF FACT.

The concurrent findings of a special master and the district judge on the question of the location of a bankrupt's principal place of business will not be disturbed upon anything less than a demonstration of plain mistake.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 929.]

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Petition by Roszelle Bros. and others to have the Continental Coal Corporation adjudicated a bankrupt. From an order adjudicating bankruptcy, the bankrupt and others appeal. Affirmed.

C. C. Moore and D. L. Grayson, both of Chattanooga, Tenn., for appellants.

C. L. Williamson, of Lexington, Ky., for appellees.

Before KNAPPEN, MACK, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. This is an appeal from an order adjudicating bankruptcy. It presents a conflict of jurisdiction over the administration of the bankrupt's estate, due to the pendency of proceedings in both the Eastern District of Kentucky and the Eastern District of Tennessee; the pivotal question (and the only one presented here) being in which of the two districts did the bankrupt have its principal place of business for the six months preceding May 5, 1916? Upon review of an order of the District Court for the Eastern District of Kentucky we held that that court, having first asserted jurisdiction, took constructive possession of the bankrupt's estate and should retain the case for the purpose of determining its own jurisdiction. In re Continental Coal Corporation, 238 Fed. 113, —— C. C. A. ——. Upon a reconsideration of the case the court below, adhering to its former opinion (235 Fed. 354), held that the bankrupt's principal place of business was in the Eastern District of Kentucky. Adjudication of bankruptcy followed.

[1] The bankrupt corporation was organized under the laws of the state of Wyoming, and it seems to be conceded that the purpose of its organization, as stated in its charter, was the owning and holding of coal lands and the mining, selling, and shipping of coal. Its legal residence was thus in Wyoming, but its principal place of business was not in that state, if indeed it has ever done any business there. It owns 2,000 acres of coal lands in Tennessee, none of which has ever been developed. All of its developed properties are in the Eastern District of Kentucky, including 15,000 acres or more in Bell county (on which it has operated during the six months period and before), and 10 coal mines from which it has mined and sold an average of more than 100,-000 tons annually. In the vicinity of the mines it has maintained four commissaries, the annual sales from which to employés and the gen-.

eral public have averaged at least $250,000. Its average annual sales of timber from its lands have amounted to between $25,000 and $40,-000. It has employed in these activities at least an average of 1,000 men (mostly miners), nearly all of whom lived in and paid rent for the company's houses (more than 500 in number) on its lands. The mining and shipment of coal, as well as the sales of merchandise, timber, and lands, and the purchase of equipment and supplies for the mines and merchandise for the commissaries have all been had exclusively in Bell county. Except where the amounts of purchases were large, they were not required to be submitted to the Chattanooga office, although it was customary to consult it and sometimes take matters up with the board of directors. Detailed accounts of transactions have been kept in the office in Bell county. The maps and original deeds of the debtor's property are kept in a vault in Bell county, prepared for that purpose. For the three years ending June 5, 1915, all its activities were under the immediate supervision and direction of the company's vice-president and general manager, who resided and had his office in Bell county. Under him was a staff of officials, including an assistant general manager, who had charge of the bookkeepers and shipping clerks, a superintendent in charge of mining operations, and a manager in charge of the commissaries. The company also maintained there a timber department, a secret service department, and a legal department. In July, 1915, an executive committee was appointed, under authority of the board of directors; and its chairman, who has since resided in Bell county, has, until the bankruptcy, taken the place of and performed the duties previously discharged by the vice president and general manager. The corporation's principal office has all the time been in Chattanooga, which is in the Eastern District of Tennessee, and its principal stockholders and all its directors and officers—except the vice-president and general manager, the chairman and another member of the executive committee—have lived there. In this Chattanooga office the president, secretary and treasurer, and sales manager gave their entire time to the company's business, exercising a general direction and supervision over the business, and communicating daily, by mail and telephone, with those in charge at the mines and of the various operations connected therewith; and from whom, as well as from those in charge of the timber, secret service, and legal departments, reports were regularly received. The financial management was exercised at the Chattanooga office, including the borrowing of money, the remittance of funds to meet the pay rolls (made out at the mines), the payments for purchases (by checks drawn at the mines and countersigned at the Chattanooga office), and the sales of coal (some of which was bought by the company from other producers) on orders (partially at least through traveling salesmen) received and passed on at the Chattanooga office, copies of the orders being sent to the office at the mines for filling. Remittances for coal sold were also received at the Chattanooga office, and deposited in the company's account at the bank in that city where its principal banking business was done. The only bookkeeping done at the Chattanooga office seems to have related to the "general accounts." The company had no property in Chatta-

nooga aside from its office furniture and equipments, books, files, and records. It did no business anywhere except in the Eastern District of Kentucky (and in Chattanooga, as stated) aside from maintaining a retail coalyard at Louisville, Ky., which is in the Western District of Kentucky.

The corporation complied with the laws of Kentucky relating to the doing of business by foreign corporations in that state, including the appointment of a resident agent for service of process. It did not comply with the laws of Tennessee in these respects. After the filing of involuntary proceedings in the Eastern District of Kentucky, the corporation caused voluntary petition to be filed in the Eastern District of Tennessee.

In this state of facts the question is narrowed to this: In which of the two localities—the City of Chattanooga, Tenn., or Bell county, Ky. —was the corporation's "principal place of business"? Appellants contend that, as applied to the facts of this case, the corporation's principal place of business—

"is that place from which supreme direction and control of its affairs is exercised, where its executive offices are located, its stockholders and directors meet, its books and records are kept, its banking and financial transactions handled, and all component parts of its business regulated and directed, as a whole."

Cases are cited in which, as applied to the facts there presented, the features mentioned have been regarded as dominating.[1]

But we think the place where the principal office is located is not necessarily the place where the principal business is carried on. Such may or may not be the case. Nor as between the place where a mining corporation's actual operations are carried on and the place where the selling is done and the principal office maintained can the latter be declared in all cases, as matter of law, the principal place of business. All the authorities recognize, as do counsel, that the question as to the place where the bankrupt carried on its principal business is purely one of fact. Each case depends upon its own special circumstances. Neither of the cases cited by appellants is on all fours with the instant case. Where a corporation has more than one mine, quarry, or manufacturing plant, situated in different districts, its office from which supreme direction and control of the business generally is had, including the operations of the several plants, may, and perhaps must, be deemed the principal place of business. Such was the case in the Slate Company Case. But that consideration does not apply to the case here. The same may be said of the case, suggested by way of illustration, of a railroad running through several jurisdictions. Nor need we be concerned with the test sometimes applied, by way of comparing the volume of business done at different places. The test of volume of business in terms either of output or of dollars and cents is not pertinent to the situation before us.

[1] In re Matthews Consolidated Slate Co. (D. C.) 144 Fed. 724, affirmed in Burdick v. Dillon (C. C. A. 1) 144 Fed. 737, 75 C. C. A. 603; In re Pennsylvania Consolidated Coal Co. (D. C.) 163 Fed. 579.

In a well-considered opinion Judge Cochran has discussed the pertinent features of the case, and has stated reasons for his conclusion that the Eastern District of Kentucky was the bankrupt's principal place of business. We agree with the conclusion and with the reasoning on which it is based. There are several cases tending more or less strongly to sustain the conclusion reached by the district judge (In re Elmira Steel Co. [D. C.] 109 Fed. 456; In re Tygarts River Coal Co. [D. C.] 203 Fed. 178; Home Powder Co. v. Geis [C. C. A. 8] 204 Fed. 568, 123 C. C. A. 94), although, as in the case of those cited by appellants, not involving situations entirely parallel with that before us. The case with which we are dealing is sui generis. We are impressed that the dominating feature of the bankrupt's business—that which gave it distinctive character—was the mining of coal. As was well said by Judge Cochran:

"It is the production end of his [the mine operator's] business that is the prominent feature and is expressed in his name. No one ever speaks of a manufacturer or mine operator as a merchant or seller of goods, but always as a manufacturer or mine operator."

Taking into account the entire situation, we are better content with the view that the debtor's principal place of business was the place where these extensive mining operations, as well as the other business mentioned, were carried on, where the maps and original deeds of the company's property were kept in a vault prepared for that purpose, where this large number of company houses and the important commissary stores were maintained (a village of themselves), where the bulk of the bankrupt's property was situated, and where suits and liens against it would naturally be enforced (in fact, several personal injury suits were pending when the testimony below was taken), and where its superintendent and manager actually resided, rather than the office in Chattanooga, in which the books were kept, the general guidance of its business effected, and from which the selling was conducted. The retail coal business and the selling of coal bought, as well as that produced by the bankrupt, were incident to its dominant coal-mining business. We also think that the fact that the bankrupt complied with the Kentucky statute and not with that of Tennessee has a tendency, although not conclusive, "to show what was in effect its principal place of business," and that this effect is not destroyed by the reason assigned that compliance with the Tennessee statute would require a considerable payment of fees, nor by the fact that, following the involuntary bankruptcy proceedings in the Eastern District of Kentucky, the debtor, pursuant to a previously formed intention, filed a voluntary petition in the Eastern District of Tennessee. The contention that a corporation is presumed, as matter of law, to know the location of its principal place of business loses its force here from the fact that it required about two weeks' investigation of facts and of law to reach a conclusion that the bankrupt's principal place of business was in Chattanooga.

[2] But assuming that the correctness of the conclusion reached below is not free from doubt, it is enough to say that mere doubts are

not enough to cause its rejection. The testimony, with a comparatively unimportant exception, was all taken in the presence of the special master; that which is the subject of the exception just stated, viz. that taken after our former' review, having apparently been taken in the presence of the judge. The master and the judge reached the same conclusions, and by similar processes of reasoning. These concurrent findings on questions of fact we would not be justified in overturning upon anything less than a demonstration of plain mistake,[2] and there is no demonstration of mistake.

The order of the district court appealed from is affirmed.

---

[2] Ohio Valley Bank Co. v. Mack (C. C. A. 6) 163 Fed. 155, 158, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184; Wabash Ry. Co. v. Compton (C. C. A. 6) 172 Fed. 17, and cases cited at page 21, 96 C. C. A. 603; Deupree v. Watson (C. C. A. 6) 216 Fed. 483, 485, 132 C. C. A. 543.