## DRYDEN et al. v. RANGER REFINING & PIPE LINE CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 25, 1922. On Petition for Rehearing, May 11, 1922.)

No. 3812.

1. Bankruptcy ⊜16—"Principal place of business" of corporation is where its principal business activities are carried on; "business of corporation."

The business of a corporation is its activities in the acquisition or production of that which its charter authorizes it to acquire or produce and its dealings with its customers, and its principal place of business, within the meaning of Bankruptcy Act, § 2(1), being Comp. St. § 9586(1), is where such activities are carried on.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Business; Principal Place of Business.]

2. Bankruptcy ⊜16—"Principal place of business" of corporation held in district where it conducted the greater part of its business, and not where it had its general offices.

A Delaware corporation had its general office in Kansas City, Mo., where its general books and records, except its stock records, were kept. Its business was the producing and refining of petroleum and sale of its products. It also owned tank cars, which it used and sometimes leased, pipe lines, etc. It owned one refinery, and seven filling stations on leased ground in Kansas City, and some small wells in Kansas; but the greater part of its property and the chief seat of its production and sales were at Ranger, Tex., where it owned and operated wells, two refineries, loading racks, pipe and water lines, and where its bills were paid and most of its sales were made, though larger contracts were submitted for approval to the Kansas City office. Its gross revenue from its business there, exclusive of the production of its Texas wells, was 4½ times as great as that received in Missouri. *Held,* that its principal place of business, within the meaning of Bankruptcy Act § 2(1), being Comp. St. § 9586(1) was in Texas, and that the court in that district had jurisdiction of proceedings in bankruptcy against it.

Appeal from the District Court of the United States for the Northern District of Texas; James C. Wilson, Judge.

In the matter of the Ranger Refining & Pipe Line Company, alleged bankrupt. From a decree dismissing the petition for want of jurisdiction, J. E. Dryden and others, petitioners, appeal. Reversed.

Joseph Manson McCormick, of Dallas, Tex., Frank Hill Rawlings, of Fort Worth, Tex., Francis Marion Etheridge, of Dallas, Tex., Power, Dryden & Rawlings, of Fort Worth, Tex., and Etheridge, McCormick & Bromberg, of Dallas, Tex., for appellants.

Wilmot M. Odell and Perry G. Dedmon, both of Fort Worth, Tex., George H. Imbrie, I. J. Ringolsky, M. L. Friedman, and Ringolsky & Friedman, all of Kansas City, Mo., Marks & Flaherty, of Ranger, Tex., Francis C. Downey, of Kansas City, Mo., and Cooke, Dedmon & Potter and Goree, Odell & Allen, all of Fort Worth, Tex., for appellees.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. The Ranger Refining & Pipe Line Company is a corporation chartered under the laws of Delaware, with its prin-

cipal office in Wilmington, Del. The by-laws provide that the corporation might also have an office in Dallas, Tex., and at such other places as the board of directors might appoint, or the business of the corporation might require; that the directors might hold their meetings, and keep the books of the corporation, other than the original or duplicate stock ledger, outside of Delaware.

On April 20, 1920, the directors by resolution established the general offices of the corporation at Kansas City, Mo. It was ordered that all stockholders' and directors' meetings should be held there, and all records, except where otherwise required by law, should be kept there. Previously an auditor's office, covering all business of the company, had been at Dallas, Tex. This was moved to Kansas City.

The business which the corporation was carrying on was the producing and refining of oil and gasoline and its sale to the public; also the using and sometimes leasing of tank cars which it owned, and the maintenance and use of certain racks, pipe lines, and water lines. While its charter authorized other business, no others had been, or were being, conducted.

The corporation owned one refinery and seven filling stations (on leased ground) in Kansas City. It owned in Texas two refineries, certain pipe lines, loading racks, six miles of water lines, and considerable other property. The chief seat of its production of oil and gas, and where it sold the greater part thereof, was at Ranger, in the Northern District of Texas.

The court found that the value of its property in Texas was at least five times as much as that in Missouri. The only property of the alleged bankrupt in Oklahoma was stock in another corporation owning certain oil leases not producing. The alleged bankrupt owned some small oil wells in Kansas. During the preceding six months, the income from these wells was $8,197.46. The production of oil and gasoline by said corporation in Texas was not less than 10 times as great as in Missouri. The gross revenue was approximately 4½ times as great, excluding the production from the oil and gas wells in Texas. The indebtedness against the corporation is $1,558,318.17. That held in Texas is $616,719.47, in Missouri $199,945.39, and outside of Missouri and Texas $741,653.31.

At Kansas City were kept the general books of the corporation. These, so far as the Texas business was concerned, were compiled from reports made from Ranger and Wichita Falls. At Ranger were kept books showing all activities of the two refineries there. At Ranger were initiated and closed all contracts for sales of the product of the two refineries, except for a small quantity of residuum sold to the Warren Oil Company. On large contracts the Ranger office consulted with, and made its contracts on the assent of the Kansas City office. That office had nothing to do with obtaining, closing, or filling the contracts, and all money thereon was collected at Ranger, though ultimately remitted to Kansas City. The traffic manager was located at Ranger, and handled there all the tank cars wherever they might be. The Wichita Falls business and production were small.

On April 27, 1921, certain creditors filed a petition in involuntary

bankruptcy against said corporation, alleging that for the greater part of the preceding six months it had had its principal place of business at Ranger, Tex. On May 5th receivers were appointed on a petition filed in said proceedings. On April 29, 1921, a like petition in involuntary bankruptcy was filed against said corporation at Kansas City, Mo., alleging that to be its principal place of business, and receivers were appointed in said proceedings on May 2d.

By proper pleadings the jurisdiction of the court was attacked in the Texas proceedings, on the sole ground that the principal place of business was at Kansas City, Mo. A reference to a special master was ordered, who took evidence in Texas and Missouri, and reported his findings of fact and conclusions of law, and, as his ultimate finding, that the principal place of business was at Ranger, Tex.

On exceptions, the District Court adopted in the main the master's special findings of fact, but held thereon, as an ultimate conclusion of fact, that Kansas City was such principal place of business, dismissed said bankruptcy proceedings in Texas for want of jurisdiction, and revoked the order appointing receivers, directing that application for allowances for services rendered by the receivers or their attorneys should be filed within 10 days, taxing costs against the petitioning creditors, with the right to them to move to retax said costs, and retained jurisdiction for the purpose of enforcing the administrative orders made.

This appeal was taken which raises the points: (1) That on the facts found by said court the principal place of business of said corporation was at Ranger, Tex. (2) That, if the court had no jurisdiction, it had no authority to retain the case for any purpose, or to tax costs against the appellants.

Bankruptcy Act, § 2, provides that the District Courts shall have power—

"to adjudge persons bankrupt who have had their principal place of business, resided, or had their domicile within their territorial jurisdiction for the preceding six months, or the greater portion thereof," etc. 30 Stat. 545, U. S. Comp. St. § 9586.

The residence and domicile of the bankrupt in this case, a corporation chartered under the laws of Delaware, is at Wilmington, Del. Southern Pacific Co. v. Denton, 146 U. S. 202, 205, 13 Sup. Ct. 44, 36 L. Ed. 942; Shaw v. Quincy Mining Co., 145 U. S. 444, 449, 12 Sup. Ct. 935, 36 L. Ed. 768. Jurisdiction, therefore, in either Texas or Missouri, must rest on the location of the principal place of business in said state. The act does not confer jurisdiction on the district in which the principal office of the company is located. The principal place of business of a natural person, equally with that of an artificial one, will confer jurisdiction.

[1] The Bankruptcy Act is one intended to deal with failures in business of those who are entitled to its benefits or subject to its administration. The business of a corporation is its activities in the acquisition or production of that which its charter authorizes it to produce or acquire, and its dealings with its customers, not its relations with its own employees or officers in its internal government, or in

applying to them the checks it may have devised in carrying on its business as security against the improvidence or negligence of agents.

For example, if a corporation had its sole place of manufacturing a product, and where it dealt with the public, at a given place, and a general office, where it produced and sold nothing, at another, but from which it gave directions to its employees at the first place, would the fact that it required its manager at the first place to submit all large transactions made by him to the approval of such office, and to remit the proceeds of his sales to it, prevent the place where the stock and manufacture was had, where its contracts were negotiated, and finally concluded, and its bills paid, from being its principal place of business? Can it alter the fact that a small part of its business of production and dealing with the public is done at the place where the general office is located, at which its internal management is carried on, when the bulk of its property, production, and business dealings, are elsewhere? We think not.

[2] Here creditors, in reliance on the fact that the chief production of this corporation takes place at Ranger, that the great majority of its dealings of all sorts with the public are carried on and closed there, and that its bills arising from this business are there paid, have instituted proceedings in bankruptcy in the district in which Ranger is located. The question is: Shall their proceeding be dismissed, on the ground that Ranger is not the principal place of business? That the fact that directors and stockholders meet at a place does not fix that location as the principal place of business is well settled. Continental Coal Corporation v. Roszelle Bros., 242 Fed. 243, 155 C. C. A. 83; In re Elmira Steel Co. (D. C.) 109 Fed. 456.

The appellants insist that the present case falls under the decision in Continental Coal Corporation v. Roszelle Bros., 242 Fed. 243, 155 C. C. A. 83, which affirms 235 Fed. 343. In that case a mining company, chartered under the laws of Wyoming, owned coal mining property in Kentucky and Tennessee. Its only operated coal mines were in Bell county, in the Eastern district of Kentucky. It had a retail yard for the sale of coal in Louisville, in the Western district of Kentucky. The mining and shipment of coal and sales of merchandise, timber, and lands, and purchases of supplies and equipment for the mine, were conducted in Bell county; large purchases being required to be first submitted to the Chattanooga, Tenn., office. The maps and original deeds to its Kentucky property were kept in Bell county. A vice president and general manager lived there, and had charge of the mining and its other activities there.

"The corporation's principal office has all the time been in Chattanooga, which is in the Eastern district of Tennessee, and its principal stockholders and all its directors and officers—except the vice president and general manager, the chairman, and another member of the executive committee—have lived there. In this Chattanooga office the president, secretary and treasurer, and sales manager gave their entire time to the company's business, exercising a general direction and supervision over the business, and communicating daily, by mail and telephone, with those in charge at the mines and of the various operations connected therewith, and from whom, as well as from those in charge of the timber, secret service, and legal departments, reports were regularly received. The financial management was exercised at the Chatta-

nooga office, including the borrowing of money, the remittance of funds to meet the pay rolls (made out at the mines), the payments for purchases (by checks drawn at the mines and countersigned at the Chattanooga office), and the sales of coal (some of which was bought by the company from other producers) on orders (partially at least through traveling salesmen) received and passed on at the Chattanooga office, copies of the orders being sent to the office at the mines for filling. Remittances for coal sold were also received at the Chattanooga office, and deposited in the company's account at the bank in that city, where its principal banking business was done. The only bookkeeping done at the Chattanooga office seems to have related to the 'general accounts.' The company had no property in Chattanooga, aside from its office furniture and equipments, books, files, and records. * * * "

Involuntary proceedings in bankruptcy were filed in the Eastern district of Kentucky, and subsequently the corporation filed a voluntary petition in the Eastern district of Tennessee. The question raised was in which district was the principal place of business.

"In a well-considered opinion Judge Cochran has discussed the pertinent features of the case, and has stated reasons for his conclusion that the Eastern district of Kentucky was the bankrupt's principal place of business. We agree with the conclusion and with the reasoning on which it is based. * * * We are impressed that the dominating feature of the bankrupt's business—that which gave it distinctive character—was the mining of coal. As was well said by Judge Cochran: 'It is the production end of his [the mine operator's] business that is the prominent feature and is expressed in his name. No one ever speaks of a manufacturer or mine operator as a merchant or seller of goods, but always as a manufacturer or mine operator.' Taking into account the entire situation, we are better content with the view that the debtor's principal place of business was the place where these extensive mining operations, as well as the other business mentioned, were carried on, where the maps and original deeds of the company's property were kept in a vault prepared for that purpose, where this large number of company houses and the important commissary stores were maintained (a village of themselves), where the bulk of the bankrupt's property was situated, and where suits and liens against it would naturally be enforced (in fact, several personal injury suits were pending when the testimony below was taken), and where its superintendent and manager actually resided, rather than the office in Chattanooga, in which the books were kept, the general guidance of its business effected, and from which the selling was conducted." Continental Coal Corporation v. Roszelle Bros., 242 Fed. 243, 245, 247, 155 C. C. A. 83, 87.

Appellees admit that the above case was correctly decided on its merits, but insist that while it is true, if the entire production of a mining or other company is located in one district, such district will be considered the location of the principal place of business, notwithstanding the company has a general office elsewhere, which exercises supreme control over the mining or other operations, and which negotiates the sales of the product of such operations, this is not the case where such company has mines or factories in more than one district, as to which the general office exercises this supervision and activity, regardless of the relative value of the two properties or the quantity of production by each, although the production and business in one district may much predominate. The basis of this distinction is not perceived. If the exercise of control and the making of sales by such office in one case does not constitute an office where the principal business is transacted, how can that office any more become the principal place of business because it deals with four-fifths of its product drawn

from one source and one-fifth from another source, instead of drawing it all from one source?

Nor can it be seen, if the place of production by the mines or refinery determined the principal place of business, that the production of only one-fifth of the total production in the same district where such general offices were located would any the less prevent the district of the location of the plant, producing four-fifths of the whole, from being the principal place of business. If, on the other hand, dealing with the public is also to be looked to in determining the location of the principal place of business, then in the case at bar there is not only more than five to one of property and production in the Texas district, but sales made, in at least the same proportion, and the conduct of all other business with the public is there, as against that conducted by the Kansas City office.

Appellees rely with confidence on the case of Burdick v. Dillon (In re Matthews Consolidated Slate Co.), 144 Fed. 737, 75 C. C. A. 603, as holding that the office which exercises supreme control and direction of the business conducted elsewhere will be considered the principal place of business of the corporation. The facts of this case, however, do not apparently consider that the supreme direction of the other agents of the corporation alone constitutes such office the principal place of business. There the principal dealings with the public were conducted by the Boston office. The case sustains the view that the place where the corporation conducts the greater part of its dealings with the public will be considered the principal place of business of the corporation rather than an office for the general control of its intra-corporate affairs. The Circuit Court of Appeals thus states the contention:

"It is the appellant's contention that the principal place of business was at the place where the quarries and mills were located, and where the working operations were conducted, rather than at the Boston office, where supreme direction and control were exercised and the bulk of the sales was negotiated." Burdick v. Dillon, 144 Fed. 737, 738, 75 C. C. A. 603, 604.

In the opinion of the District Court, which is adopted by the Circuit Court of Appeals, speaking of the Boston office, it is said:

"The minutes of the directors and the corporation books of account were kept there. Its correspondence was conducted from there. The great bulk of sales of the product of the quarries and mills was negotiated there or from there; about 1 per cent. only of the total sales being made from Poultney. All bills for produce sold were sent out from there, being there made up from shipping slips forwarded there from Poultney. * * * One regular salesman was employed, who was to be found there, except when on the road, and who was never to be found at the quarries or at Poultney. When on the road, his reports were all made to the Boston office, and all orders from him were received there; but only a small proportion of the sales was made by him." In re Mathews Consolidated Slate Co., 144 Fed. 724, 729.

The court held that under these facts the Boston office was the principal place of business. It might be so held where the bulk of the business of the corporation in dealing with the public—that is, its sales—were negotiated, concluded, and collections made, at that place. Where a corporation conducts its business at a number of places,

no one of which is plainly the place where its business is principally conducted, one of such places, where a substantial business is transacted, and from which general supervision of all of its business is exercised, may be properly held to be the principal place of business of such corporation.

"It is not easy, nor is it required, to lay down any general rule for determining which one of several places at which a corporation does business is its principal place of business." In re Worcester Footwear Co. (D. C.) 251 Fed. 760, 761.

No general rule is here attempted. In the present case, not only the great excess of property is located in the Texas district, and the great bulk of production there made, but by far the greatest amount of sales, dealing with the public, the end for which the production was had, was negotiated and completed at the Ranger office. The very name of the corporation pointed to Ranger as the place where its principal business would be conducted, and, while by no means conclusive, is a circumstance to be considered. Therefore, whether the place where the bulk of its property is located, where the greatest production of its output occurs, or where its sales and business are conducted, be considered, Ranger was the office of its principal business activities, and the District Court of that district had jurisdiction of the petition filed therein on April 27, 1921.

The decree dismissing said cause for want of jurisdiction is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

### On Petition for Rehearing.

PER CURIAM. The business of the bankrupt, Ranger Refining & Pipe Line Company, is the production and refining of oil products and the sale of them to the public. Whether the production and refining of such products or their sale is considered the principal business of said bankrupt, the great bulk of each business is conducted at Ranger, Tex. An adjunct to this business, to wit, the furnishing of tank cars, is also conducted from this point. The public, dealing with the bankrupt, dealt in the main with and through the Ranger office.

The control exercised by the Kansas City office was an intracorporate control, not the transaction of business of production or with the public, except in the comparatively small volume of production there had, and of sales there made. Considering the production of the articles dealt in and the dealings with the public as constituting the business which is meant in the expression in the Bankruptcy Act, "principal place of business," we adhere to the conclusion that Ranger, Tex., was the bankrupt's principal place of business.

Petition for rehearing denied.