**In re DeSOTO CRUDE OIL PURCHASING CORPORATION.**

**No. 6281.**

District Court, W. D. Louisiana.

Oct. 1, 1940.

G. C. Parker and Robert B. Keenan, both of Longview, Tex., and Lamont Seals, of Homer, La., for movants.

Philip H. Mecom, of Shreveport, La., for trustee Harry E. Harper.

Leon O'Quin and Blanchard, Goldstein, Walker & O'Quin, all of Shreveport, La., for DeSoto Crude Oil Purchasing Corp., bankrupt.

J. M. Grimmet, of Shreveport, La., referee.

PORTERIE, District Judge.

The petition was one in voluntary bankruptcy, filed on July 2, 1940; adjudication in bankruptcy was on July 3; trustee was elected on July 20, at first meeting of creditors. Motion to dismiss was filed on August 10, alleging the want of jurisdiction of this district court, based mainly on the ground that the principal place of business of the bankrupt was in the eastern district of Texas. Hearing was had on the motion before a special master (the Referee for the District) on August 30; on this same day, August 30, previous election of trustee was ratified by creditors; recommendation of the special master was filed on September 7; movants excepted to the report, and appealed; hearing on the motion to dismiss was had before the district court on September 19, 1940. The court is now to rule on the motion to dismiss.

After reading the record of the evidence in this case, the court finds that the statement of facts as made by the special master is correct. Summarizing and condensing: The bankrupt is a Delaware corporation. Its by-laws provide that it may have offices in Shreveport, Louisiana, and Overton, Texas, and such other places as the board of directors may appoint or the business of the corporation require. Its business was the purchase and sale of crude oil. The corporation established offices at Shreveport and the board of directors held meetings in these offices, in the First National Bank Building. All of the officers and employees who managed and conducted the business of the corporation were housed in the offices in the First National Bank Building, where all business transactions were had. All books, records, division orders, contracts,

documents and papers relating to the business were kept in the Shreveport office. The business of purchasing and selling crude oil was, with very few exceptions, carried on at Shreveport, and was usually passed on by Mr. J. E. Marshall, the vice-president. All banking business was with the First National Bank of Shreveport, from which bank, by check, all bills and obligations were paid. Even at moment of bankruptcy, there was cash in bank in the amount of over $10,000. A petty cash fund, never exceeding $250, was kept for the convenience of the field office, at Overton. All material and supplies were purchased through the office at Sheveport, where the purchasing agent of the company was located; the exception being that in an emergency some material might be bought elsewhere, in which event the purchase was later approved by the purchasing agent.

Property owned by the corporation and situated in Louisiana consisted of the office furniture and fixtures, records, and cash in bank. Property owned in East Texas consisted of pipe line, rights of way over which the pipe line was run, connections necessary to producers' tanks, pump stations, and buildings to house them, storage tanks, a small field office at Overton, some furniture and fixtures, an automobile, a dwelling house and a small apartment.

The pipe line, approximately fifty-six miles in length, was situated in Rusk and Smith Counties, Texas. The oil which was purchased by this corporation was produced from wells located in Rusk and Smith Counties and was transported through this line to the purchaser. The ownership of the oil was vested in persons domiciled in Texas, Oklahoma, Florida, New York, Maine, New Mexico—in fact, in twenty-four states and in Cuba and Canada.

There was a field office at Overton, Texas, used for the convenience of contacting and reporting to the Federal Tender Board and the Railroad Commission of Texas, and in communicating with the office in Shreveport. Most of the time there was a superintendent in charge, whose duty it was to see that the men were on the job, that the station was run properly and that the equipment was taken care of, and, in general, whose duty it was to take care of the mechanics of the operation of the pipe line, under the direction of the Shreve-

port office. No one located in the field office at Overton was authorized to buy or sell oil. This was done solely in the office at Shreveport. For some time prior to bankruptcy, there was no superintendent at the Overton office.

The principal purchaser of the crude oil was the Hurricane Petroleum Corporation, operating a refinery at Overton. At intervals oil was sold to others, but at the time of bankruptcy, the Hurricane Petroleum Corporation was purchasing all the oil. The Hurricane Petroleum Corporation is one of five companion companies operated out of the same office at Shreveport and under the same management as the DeSoto Crude Oil Purchasing Corporation.

Counsel for mover depends heavily upon the case of Dryden et al. v. Ranger Refining & Pipe Line Company et al., 5 Cir., 280 F. 257. We quote from the syllabus of the decision: "A Delaware corporation had its general office in Kansas City, Mo., where its general books and records, except its stock records, were kept. Its business was the producing and refining of petroleum and sale of its products. It also owned tank cars, which it used and sometimes leased, pipe lines, etc. It owned one refinery, and seven filling stations on leased ground in Kansas City, and some small wells in Kansas; but the greater part of its property and the chief seat of its production and sales were at Ranger, Tex., where it owned and operated wells, two refineries, loading racks, pipe and water lines, and where its bills were paid and most of its sales were made, though larger contracts were submitted for approval to the Kansas City office. Its gross revenue from its business there, exclusive of the production of its Texas wells, was 4½ times as great as that received in Missouri. *Held*, that its principal place of business, within the meaning of Bankruptcy Act, § 2(1), being Comp.St. § 9586 (1), [11 U.S.C.A. § 11(1)] was in Texas, and that the court in that district had jurisdiction of proceedings in bankruptcy against it."

We believe the special master well says: "* * * Inanimate things such as oil, pipe lines, tanks, pumps, etc., may be the objects of commerce and of business, but they do not within themselves carry on business. Inanimate things cannot create a business. Therefore, the facts of this case clearly show that all business of

the bankrupt corporation was transacted at the office at Shreveport, Louisiana, and that the oil produced (not by this bankrupt, however) in the eastern district of Texas, and the pipe lines through which it was transported to a market, were merely the objects of commerce, carried on by the animate beings located in the Shreveport office. The record discloses that the oil produced in east Texas and purchased by the bankrupt corporation was owned by persons in twenty-four states and two foreign countries. In the Ranger case, business was actually carried on at a particular place; that is, Ranger, Texas. No such condition prevails in the present case."

The main factual difference between the instant case and the Dryden case is that in this case the bankrupt corporation owned no wells, did not engage at all in the production of oil, owned no refinery to process the oil; contra in the Dryden case. The bankrupt in this case was only an oil factor. It was engaged in the purchase of crude oil on top of the ground for the purpose of resale of the same unprocessed crude oil to some purchaser, generally a refiner. The pipe line was used by the bankrupt to effectuate the factoring in crude oil. Factoring in crude oil was the sole and, consequently, the principal business of this bankrupt. The purchases and the sales were altogether made in the city of Shreveport in this district.

In the Dryden case, the drilling of wells, their subsequent operation in case of oil found, and the refining of the crude oil, followed by sales of the refined products, were all accomplished at Ranger, Texas, the very situs of the wells and the refineries and the location of the main offices. A large force was maintained at Ranger, Texas, a great part of which was engaged in the extensive manual labor involved, but also a substantial part of the local force was engaged in the mental effort necessary to sale and distribution. Nothing of the sort existed in the instant case.

Therefore, this fundamental difference of facts in the two cases brings a diametrically opposite legal conclusion. The special master so ruled, and we must approve.

To repeat: It is shown by the undisputed testimony in the record that the bankrupt DeSoto Crude Oil Purchasing Corporation was a factor or dealer in but one commodity, crude oil. Its very name implies that it was a crude oil purchasing corporation. It did not produce or mine from the ground any crude oil, but made purchases from owners of wells, who captured fugitive oil in the earth and brought it forth as a salable commodity. The bankrupt was not a common carrier, transported no crude oil or other product through its pipe line for hire, and published no rates for transporting crude oil or any other mineral for the public. The only use made by the bankrupt of its pipe line was in transporting its own crude oil, after buying it, from the tanks of the producer and seller to the refinery or storage tanks of the processor and buyer. The bankrupt did not process any crude oil. The market for its product was usually a refinery or refineries, situated at Overton, and the only use made of the pipe line it owned and operated was in the delivery of its purchases.

Besides the Dryden case, counsel for movers cite the case of Continental Coal Corporation v. Roszelle Bros., 6 Cir., 242 F. 243. It was held there that the bankrupt had its principal place of business in Kentucky and not Chattanooga, in Tennessee. The bankrupt had ten coal mines, 15,000 acres of developed coal lands, four commissaries near the mines selling $250,000 of merchandise annually; sold between $25,000 and $40,000 of timber annually; employed one thousand miners and others, who lived in company houses; all in Bell County, Kentucky. The mining and shipment of coal, the sales of merchandise, timber and lands, and the purchase of equipment and merchandise, were done in Kentucky, and these operations were carried on by a resident vice-president and general manager. The same factual difference exists here as was ascertained by the full comparative discussion of the Dryden case and the instant case.

In re Tygarts River Coal Company, D. C., 203 F. 178, which is also a coal mining case, is cited. The facts therein are similar to those of the Continental Coal Corp. v. Roszelle Bros., supra. Its mines and operations and management were in West Virginia and its corporate office in Philadelphia. It has no direct application to the facts in the present case; except that by implication, conversely, it supports our ruling here.

We disregard the case of In re American & British Manufacturing Company, D.C., 300 F. 839, cited by movers,

because it is so clearly dissimilar in facts to the instant case. It is good, however, on the point that the principal place of business is always one of fact, depending upon the circumstances of the particular case.

Then, we are directed to the case of Home Powder Co. v. Geis, 8 Cir., 204 F. 568. The bankrupt conducted mining business for lead and zinc and had its reduction works in Missouri; also made all its sales and met its large payroll there. The court refused to revoke the jurisdiction in Missouri and place it in Chicago, whence the bankrupt received its financial super-control. No situation like that of this case is found.

The case of In re Monarch Oil Corporation, D.C., 272 F. 524, presents no facts approaching those of the instant case. No use may be made of it here.

The case of Lawrence v. Atlantic Paper & Pulp Corporation, 5 Cir., 298 F. 246, deals with a New York corporation organized to build a pulp mill in Georgia, where it had an office for the transaction of business, and where the records, books and accounts were always kept. The corporate office was in Georgia and all property was in Georgia. It has no application to the present case, because of the same reasoning developed in the Dryden case discussion.

We have consulted Note 94, Section 11, Title 11 U.S.C.A., Bankruptcy, "Principal place of business of corporation as conferring jurisdiction generally." From the general principles there found, deduced from the holdings of cases, we are convinced that jurisdiction of the instant case is in this district. All of the cases cited by both sides are found under this Note.

From the case of In re Pennsylvania Consol. Coal Co., D.C., 163 F. 579, we quote from the syllabus, which embodies the facts fully: "A coal company was incorporated in West Virginia, and its principal place of business, as stated in its charter, was in that state, as were also its coal mines and lands which constituted all of its real estate. From the time of its incorporation, however, its executive office was maintained in Philadelphia, and there all of its financial matters were transacted, its books kept, and its banking business done. Its letter heads gave that as its location, and it made all of its collections and a large part of its sales from there; but it had not complied with the laws of the state to entitle it to do business

therein. For a time it also maintained offices at its mines; but for about a year before the filing of a petition in bankruptcy against it the mines had not been operated, and its only office was in Philadelphia, where it transacted some business relating to financial matters. A petition in bankruptcy was filed against it in the Eastern district of Pennsylvania, on which an adjudication was made, and later a proceeding was instituted in West Virginia, on which a receiver was appointed, but no adjudication made. Some of its creditors resided in one state, and some in the other. *Held* that, during the six months prior to the proceedings, its principal place of business was in the Eastern district of Pennsylvania, and that the court in such district had jurisdiction, and, having first exercised it, should retain the proceedings to the exclusion of the West Virginia court, in the absence of proof that it would be to the greater convenience of the parties in interest that the proceedings should be transferred."

As in the above case, we find no proof in this record showing it would be to the greater convenience of the parties in interest that the proceedings should be transferred to the eastern district of Texas. The principal place of business of the bankrupt being in Shreveport, this court has jurisdiction, and having first exercised it, should retain the proceedings to the exclusion of the Texas court.

After all, where was the principal place of business of the bankrupt located when it was doing business? Shreveport is the inevitable answer. If it were then practical and to the interest of the corporation to locate its principal place of business at Shreveport, why should not its administration under bankruptcy be conducted at the same place? Shreveport is judicially recognized as a leading oil center; we are dealing with the profitable and advantageous sale for the benefit of creditors of the assets of a bankrupt corporation engaged in buying, selling and delivering crude oil. Shreveport is the proper center for a successful sale. Tyler, Texas, the division point of the eastern district of Texas to which this case would go, is not an oil center. Overton is only eighty-three miles from Shreveport. As to the facility for the main body of creditors to file their claims, the availability to them of mail service is the same to Shreveport as to Tyler.

We find that the Circuit Court of Appeals, for this circuit, in the case of Shearin v. Cortez Oil Co., 92 F.2d 855, has very aptly construed the law controlling this case, and we quote from the decision, on page 857 of 92 F.2d, as follows: "The court of the Northern District of Texas has jurisdiction. The corporation was chartered in the state of Delaware, and its nominal domicile is there, but its one office and all its property and business are in Texas. It rents an office, keeps its books and its bank accounts and attends to its correspondence and its general business, including making up tax returns and oil reports, at Fort Worth in the Northern District. There its officers reside and there they hold their meetings and those of stockholders. The corporation owns six small oil wells and they are in the Southern District of Texas, where the oil is produced and delivered to the pipe line; the proceeds of which is the company's income. The company, however, does nothing there but to have one employee to 'nurse' the wells and to keep the machinery in repair and send in daily reports to the office. Any one seeking to buy oil or pay a debt or have any other transaction with the company would go to the office at Fort Worth. An officer of the law in Texas would go there to serve the corporation or make any demand upon it. We think that as between the Northern and Southern Districts of Texas the holding that the principal place of business was in the Northern District was justified. Compare Dryden v. Ranger Refining Co. [5 Cir.], 280 F. 257, and Burdick v. Dillon [1 Cir.], 144 F. 737."

There were even wells owned and operated in the above case; none in the present case; for the greater reason, then, is the ruling above in support of our present holding.

See, also, In re Mathews Consolidated Slate Co., D.C., 144 F. 724, and Burdick v. Dillon, 1 Cir., 144 F. 737. These two cases are powerful precedents for our theory of decision herein.

The recommendation of the special master as to jurisdiction is accepted and approved; the motion to dismiss based upon want of jurisdiction is overruled and denied.

■ In addition to the question of jurisdiction or venue involving the determination of the principal place of business of the bankrupt, paragraph 2 of the motion to dismiss sets forth that the original schedules, as filed, were admittedly incomplete in that there was disclosed merely an aggregate indebtedness of $132,290 for crude oil purchased, without the names and addresses of such creditors and the amounts due each; and, as a result, few, if any, of this class of creditors, which includes those presenting the motion, had any notice of the first meeting of creditors or "voice" in the selection of the trustee herein.

Certain exceptions to the report of the special master refer to his findings with regard to the subject matter of this complaint, but it is not clear that the question suggested is sought to be presented as separate and distinct from the question of jurisdiction. In fact counsel for the creditors moving to dismiss this proceeding intimated in oral argument that the point was included in the motion to dismiss because he considered a somewhat similar state of facts to have been referred to in the case of Dryden v. Ranger Refining & Pipe Line Company, 5 Cir., 280 F. 257, involving the question of jurisdiction.

By the Bankruptcy Act, jurisdiction is not made to depend upon the correctness of the schedule of creditors or the fact that the creditors actually receive notice of the proceedings. Provision is made for a schedule of creditors and also for notice to creditors, but jurisdiction either of the proceeding or to grant a discharge is not made to depend upon the correctness of the schedule or the actual reception of notice by creditors. See In re Archenbrown, Fed.Cas. No. 504.

■ Individual creditors who conceive themselves aggrieved by the action of the referee in approving the election of a trustee may take a review in their own names, but the appointment must be questioned by petition for review within the time and in the manner prescribed by Section 39 of the Bankruptcy Act, U.S.C. 11, Sec. 67, 11 U.S.C.A. § 67. See Collier on Bankruptcy, 14th Ed., p. 1659, and cases there cited.

■ Paragraph 2 of the motion to dismiss the voluntary petition of the bankrupt as a petition for review of the order of the referee not only fails to comply in any respect with the requirements of Section 39 of the Bankruptcy Act, but, if so intended, would concede jurisdiction in this court and be totally inconsistent with

the motion to dismiss. The question suggested does not appear to be properly before the court even though a review of the order of the referee was intended; but had the matter been properly presented, there would seem to be no reason not to affirm the order of appointment.

The voluntary petition of the bankrupt was filed on July 2, 1940, and it appears that because of the complications of accounting for crude oil purchases in the ordinary course of that business a detailed list of such creditors was not then available. Upon being advised that the bankrupt no longer had an accounting force to adequately complete the schedule of creditors, the referee proceeded promptly to obtain a detailed list in strict observance of his duty under Section 39 of the Bankruptcy Act. It appears, however, that this list could not be completed until August 5, 1940, when notices were mailed to all such creditors.

On August 3, 1940, a receiver was appointed upon the application of the bankrupt, which application was apparently made for the protection of the producers of crude oil from whom the bankrupt normally purchased, and indicated a necessity for the prompt appointment of a trustee.

■ On July 9, 1940, the referee gave notice of the first meeting of creditors, which was held on July 20, 1940, and at which H. E. Harper was unanimously elected trustee by the creditors who had presented their claims. Complaint is made that this meeting was irregular since those creditors whose claims were based upon sales of crude oil had not then received formal notice; but it appears that because of some typographical or similar error in recording the appointment of the trustee, all creditors, including those owed for crude oil, aggregating $132,290, were subsequently notified that at a meeting of creditors to be held on August 30, 1940, the referee would ask that an order be entered nunc pro tunc correcting the order of appointment. At this meeting the order appointing the trustee was corrected and properly entered without objection from any creditor of any class or character except that counsel for the three creditors moving to dismiss the proceeding, while refusing to file claims or participate in the proceeding because of the challenge to the jurisdiction, entered a formal objection consistent with the motion to dismiss.

■ The fundamental purpose of the Bankruptcy Act is to reduce the assets of an estate to cash as speedily as practicable for equitable distribution to the creditors, West Texas Construction Company v. Nelson, 5 Cir., 77 F.2d 754; and the fundamental purpose of notice to creditors is to give to each an equal opportunity with other creditors to avail himself of the benefits of the law.

In this case all creditors of the bankrupt, other than those presenting the motion under consideration, affirmatively concurred in or must be held to have concurred in the appointment of the trustee, and these three creditors presenting this motion have refused at all times to participate in the proceeding. It is evident that if they had received notice of the original meeting of creditors, they would not have filed their claims to qualify to vote for a trustee; and it is consequently difficult to understand how they can complain of the appointment of the trustee in a proceeding in which they would take no part.

■ That the Bankruptcy Act does not contemplate that the schedule of creditors of the bankrupt shall necessarily be complete is clearly indicated by Sections 7, 17 and 55 of the Act, U.S.C. 11, Secs. 25, 35 and 91, 11 U.S.C.A. §§ 25, 35, 91; and while the referee's duty is to make the list of creditors filed as complete as may be, the law does not contemplate a delay in the election of the trustee until this is accomplished. See In re International Match Corporation, D.C., 3 F.Supp. 443; also, In re Schiller, D.C., 96 F. 400.

■ As was clearly pointed out in the decision in Gurewitz v. Wise, 122 Me. 444, 120 A. 536, the creditors presenting the motion under consideration have been deprived of no right which will prevent them from sharing equally with other creditors of the bankrupt and receiving their proportional share of the estate.

"The object of the mailed notices provided for in the bankrupt act is to protect the rights of creditors. If they have actual knowledge of the proceedings in time to do this, equal protection is afforded them.

"Plaintiff's actual knowledge in the case at bar came to him in ample season to protect his rights. It is not necessary that he have knowledge at the very beginning

8

of the proceedings, so that he may vote for trustee and take part in every succeeding step. Davis v. Findley, 201 Ala. 515, 78 So. 869. The fact that plaintiff did not have an opportunity to vote for a trustee would not alter the case, for, in considering the relative amount of plaintiff's claim as against the size of the estate and number of creditors, his loss of the right to act in the selection of a trustee cannot be considered as a very material deprivation of any of his rights. He received notice, and in time to have participated in all of the material proceedings and to have secured his proportional share of the estate. Morrison v. Vaughan, 18 A.B.R. [704] 707, 119 App.Div. 184, 104 N.Y.S. 169." 122 Me. 444, 120 A. at page 537.

All creditors of the bankrupt, other than those presenting this motion to dismiss, have concurred in the appointment of H. E. Harper as trustee of the bankrupt estate, and these three creditors with relatively small claims admit that they would at no time have participated in the selection of a trustee. It seems that the proceedings before the referee were entirely regular and in complete accord with the Bankruptcy Act.

The court has taken special notice of, and has given particular attention to, the fact, as urged by movants, that the attorney for the bankrupt is likewise the attorney for one of the main secured creditors.

The writer of this opinion has great confidence in the integrity, and great respect for the professional ability, of the attorney found in this dual position. We have no reason, however, to criticise the attorney for the movants. He feels it is to the interest of his clients to make the point. The court is of the view, however, that if there were any evil purpose, the dual position as attorney would never have been taken. It is too much like a red flag; it attracts immediate attention. So easy, on the other hand, would have been the plan for the creditor corporation to have appeared through another lawyer at the creditors' meeting, or, better, through one of its own officers. The mistake was made, though, and we must consider it.

To decide on the point as to whether or not ulterior motives are back of the attorneys on either side, a most proper question to ask is whether or not there is any possible hope for payment of anything to unsecured creditors. The pipe line is the only real asset. There is a first mortgage of something over $40,000 on the pipe line and all of its appurtenances, followed by a second mortgage of $106,000. It is conceded by everyone, without debate, that the physical plant is not worth nearly the sum of the two mortgages. Therefore, there is not the possibility of a cent being paid to the unsecured creditors. This explains why the second mortgagee creditor readily took the item of $50,000 from its total mortgage item of $106,000 and placed this $50,000 in the class of an unsecured debt. Admittedly, this is an advantage given to the other unsecured creditors for an improved position in the amount of $50,000.

Moreover, and most important of all, there appears, after examination of the petition and the schedules filed, no fraud of any kind—or any indication of such. The schedules are fully and honestly prepared. Movants admit the trustee is honest, of good reputation, and that he has had experience.

It was argued at the hearing that because movants, being unsecured creditors, could not hope to get a dime out of this bankruptcy administration, the attorney representing them must have been actuated mainly, perhaps solely, by the selfish purpose of moving the case out of this jurisdiction so that the administrative plum could be his, once the tree was placed in his orchard. We give no credence whatever to this suggestion, either.

The court is compelled to write of these two points made by opposing counsel, though quite personal in character. The brief of counsel for movants urges the dual position of the attorney strenuously. Fundamentally, however, we find neither innuendo affects the case legally.

For the reasons assigned, the report of the special master is again confirmed and the motion to dismiss is again, fully and finally, denied.

Decree accordingly will be signed upon presentation.